IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------X

SHIRLEY CRAIG, Individually and on        :
Behalf of All Other Persons Similarly Situated,     :
                                                         :    No. 4:08-cv-02317(JEJ)
                                  Plaintiffs,      :
                                                         :
                    -against-                       :
                                                         :
RITE AID CORPORATION and ECKERD    :
CORPORATION d/b/a RITE AID,             :
                                                         :
                                  Defendants.   :

-----------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED
MOTION FOR FINAL APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT, FOR AN AWARD OF EXPENSES AND
ATTORNEYS' FEES, AND FOR APPROVAL OF INCENTIVE AWARDS
TO THE CLASS REPRESENTATIVES**

<div style="margin-left:40%">

Seth R. Lesser
Fran L. Rudich
Michael J. Palitz
Klafter Olsen & Lesser LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
*Lead Counsel for the Plaintiffs and Classes*

Peter Winebrake
Andrew Santillo
Mark Gottesfeld
WINEBRAKE & SANTILLO, LLC
Twining Office Center, Suite 211
715 Twining Road
Dresher, Pennsylvania 19025
*Local Counsel for the Plaintiffs and Classes*
Additional Counsel Listed on
Signature Page

</div>

# TABLE OF CONTENTS

I.    Introduction ...................................................................................................1

II.   Procedural Background ....................................................................................3

      A.  *Shirley Craig v. Rite Aid Corp., et al* ........................................................5

      B.  *Eddie Ibea v. Rite Aid Corp.* ...................................................................7

      C.  *Jennifer Elliot, Jose Fermin, & Yvon Witty v. Rite Aid Corp., et al.* ..........9

      D.  *James Fisher and Daniel Knepper v. Rite Aid Corp., et al.* .....................11

      E.  *Sheryl Doyon v. Rite Aid Corp., et al.* .....................................................14

      F.  *Ralph Cedano & Donna Garcia v. Rite Aid Corp., et al* ..........................15

      G.  *Justin Torres & Priscilla Thomas v. Rite Aid Corp., et al* .....................188

      H.  The Remaining Cases ..............................................................................18

III.  Summary of the Terms of the Settlement, the Notice That Was Sent and The
      Classes' Reaction ...........................................................................................25

IV.   Standards and Procedures for Final Approval of Class Action Settlements ...30

      A.  Application of the *Girsh* Factors ...............................................................34

          1.  Complexity, Expense and Likely Duration of the Litigation ...............34

          2.  The Absence of Objections is Evidence of the Reasonableness of the
              Settlement ........................................................................................37

          3.  Stage of the Proceedings and the Amount of Discovery Completed ..39

          4.  Risks of Establishing Liability and Establishing Damages ................40

          5.  Risk of Maintaining the Class Action Through the Trial ...................42

          6.  Ability of the Defendants to Withstand Greater Judgment ................42

7.   Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation ..................43

B.  The Plan of Distribution of the Settlement Fund is Fair ..........................45

C.  Class Counsels' Request for Reimbursement of Expenses Should Be Approved...................................................................................................46

D.  Class Counsels' Request for Attorneys' Fees and Costs Is Reasonable and Should be Approved by the Court...........................................................47

E.  The Incentive Awards to the Settlement Class Representatives Should Be Approved...................................................................................................56

V.  Final Certification of the Proposed Class is Appropriate to Resolve All Claims Against Defendants ...........................................................................................59

A.  The Elements of Rule 23(a) are Satisfied in the Present Case ..............601

1.  Numerosity Under Rule 23(a)(1)..........................................................60

2.  Commonality Under Rule 23(a)(2)......................................................611

3.  Typicality Under Rule 23(a)(3) ............................................................64

4.  Adequacy Under Rule 23(a)(4)............................................................65

B.  The Requirements of Rule 23(b)(3) Are Met in the Settlement Context...66

VI.  Conclusion ..................................................................................................72

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods. Inc. v. Windsor,* 521 U.S. 591 (1997) .................................... *passim*

*Armstrong v. Board of School Dirs. of the City of Milwaukee*, 616 F.2d 305
  (7th Cir. 1980) ........................................................................................... 33

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ............................................... 61, 62

*Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3d Cir. 1998) ...................................... 61

*Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) ...................................... 38

*Benjamin v. Dep't of Pub. Welfare*, 807 F. Supp. 2d 201 (M.D. Pa. 2011) .... *passim*

*Borcea v. Carnival Corp.*, 238 F.R.D. 664 (S.D. Fla. 2006) .................................. 66

*Bradburn v. 3M*, 513 F. Supp. 2d 322 (E.D. Pa. 2007) .......................................... 53

*Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974) ........................ 32

*Careccio v. BMW of North Am. LLC*, 2010 U.S. Dist. LEXIS 42063
  (D.N.J. 2010) ........................................................................................... 37, 50

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) .................................................... 32

*Cook v. Rockwell Int'l Corp.,* 151 F.R.D. 378 (D. Colo. 1993) .............................. 65

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) .................................................... 43

*Cuevas v. Citizens Fin. Group, Inc.*, 2011 U.S. Dist. LEXIS 155160
  (E.D.N.Y. 2012) ....................................................................................... 62, 70

*Damassia v. Duane Reade. Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008) ............... *passim*

*Dietrich v. Bauer,* 192 F.R.D. 119 (S.D.N.Y. 2000) .............................................. 68

*Eisenberg v. Gagnon,* 766 F.2d 770 (3d Cir. 1985) ................................................60

*Erheart v. Verizon Wireless,* 609 F.3d 590 (3d Cir. 2010).....................................31

*Erie County Retirees' Ass'n v. County of Erie,* 192 F. Supp. 2d 369
  (W.D. Pa. 2002) .................................................................................................48

*Espinoza v. 953 Assocs. LLC*, 2011 U.S. Dist. LEXIS 132098 (S.D.N.Y. 2011)...70

*Fisher Bros. v. Phelps Dodge Indus., Inc*., 604 F. Supp. 446
  (E.D. Pa. 1985)............................................................................... 32, 43

*Fisher v. Rite Aid Corp*., 2010 U.S. Dist. LEXIS 56383 (D. Md. 2010)................12

*Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147 (1982)...................................64

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)…………………………… . *passim*

*Godshall v. Franklin Mint Co*., 2004 WL 2745890 (E.D. Pa. 2004) ......................57

*Gunter v. Ridgewood Energy Corp*., 223 F.3d 190 (3d Cir. 2000). ........................49

*Han v. Sterling Nat. Mortg. Co., Inc*., 2011 U.S. Dist. LEXIS 103453
  (E.D.N.Y. 2011).................................................................................................70

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998) ............................... 60, 69

*Hayworth* v. *Blondery Robinson* & *Co.,* 980 F.2d 912 (3d Cir. 1992)...................64

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ............................................................49

*Hochschuler v. G.D. Searle* & *Co.,* 82 F.R.D. 339 (N.D. Ill. 1978) ......................67

*Ibea v. Rite Aid Corp*., 2012 U.S. Dist. LEXIS 4682 (S.D.N.Y. 2012) ...................8

*In re AremisSoft Corp. Sec. Litig*., 210 F.R.D. 109 (D.N.J. 2002)………………..53

*In re Asbestos Sch. Litig*., 104 F.R.D. 422 (E.D. Pa. 1984)........................ 62, 64, 65

*In re ATI Techs., Inc. Sec. Litig*., 2003 U.S. Dist. LEXIS 7062

(E.D. Pa. Apr. 28, 2003)…………………………………………………..53

*In re AT&T Corp.,* 455 F.3d 160 (3d Cir. 2006) ............................................. 34, 49

*In re Auto. Refinishing Paint Antitrust Litig.,* 2008 U.S. Dist. LEXIS 569
  (E.D. Pa. 2008).................................................................................................57

*In re Cell Pathways, Inc., Sec. Litig. II*, 2002 U.S. Dist. LEXIS 18359
  (E.D. Pa. Sept. 24, 2002)……………………………………………………..53

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001). .............................. *passim*

*In re Computron Software, Inc.*, 6. F. Supp. 2d 313 (D.N.J. 1998)………...........53

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.
  Supp. 659 (D. Minn. 1974) ....................................................................................43

*In re Corel*, 293 F. Supp. 2d 484 (E.D. Pa. 2003) ....................................................53

*In re Corrugated Container Antitrust Litig.,* 643 F.2d 195 (5th Cir. 1981)............33

*In re Datatec Systems, Inc. Secs. Litig*., 2007 WL 4225828 (D.N.J. 2007) .... *passim*

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768
  (3d Cir. 1995) ....................................................................................... *passim*

*In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D. Pa. 2000).. 45, 49

*In re Ins. Brokerage Antitrust Litig.,* 2007 WL 2916472 (D.N.J. 2007) .................57

*In re Mex. Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001) ...........................69

*In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465
  (S.D.N.Y. 1998) .................................................................................................56

*In re Pet Food Prods. Liab. Litig*., 629 F.3d 333 (3d Cir. 2010) ...........................33

*In re Pressure Sensitive Labelstock Antitrust Litig.,* 584 F. Supp. 2d 697
  (M.D. Pa. 2008)..................................................................................................47

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283
(3d Cir. 1998) ............................................................................................. *passim*

*In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) ............. 47, 48, 56

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) ........................ *passim*

*In re Safety Components Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. 2001) ... 42, 47

*In re Schering-Plough Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 121173
(D.N.J. 2009) ................................................................................................ 47, 53

*In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322 (E.D. Pa. 1976) ........................67

*In re Telectronics Pacing Sys.,* 172 F.R.D. 271 (S.D. Ohio 1997) ........................68

*In re Vicuron Pharma., Inc. Sec. Litig.*, 512 F. Supp. 2d 279 (E.D. Pa 2007) ........56

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ............. *passim*

*Knepper v. Rite Aid Corp.*, 675 F.3d 249 (3d Cir. 2012) ........................................13

*Lake v. First Nat'l Bank*, 900 F. Supp. 726 (E.D. Pa. 1995) ....................................44

*Lan v. Ludrof*, 2008 WL 763763 (W.D. Pa. 2008) ....................................................48

*Larson v. Sprint Nextel*, 2010 WL 234934 (D.N.J. 2010) ........................................33

*Lazy Oil Corp. v. Watco Corp.*, 95 F. Supp. 2d 322 (W.D. Pa. 1997) ............. 48, 58

*Lenahan v. Sears, Roebuck & Co.*, 2006 U.S. Dist. LEXIS 60307
(D.N.J. 2006) .......................................................................................... 38, 39, 54

*Lewis v. Curtis,* 671 F.2d 779 (3d Cir. 1982) ..........................................................65

*Marisol A. v. Giuliani,* 126 F.3d 372 (2d Cir. 1997) ................................................64

*Martin v. Foster Wheeler Energy Corp.*, 2008 U.S. Dist. LEXIS 25712
(M.D. Pa. 2008) ..............................................................................................57

*McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304 (D. Mass. 2004)..................63

*Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455 (E.D. Pa. 2008).............. 57, 58

*Morris v. Affinity Health Plan, Inc.*, 2012 U.S. Dist. LEXIS 64650
  (S.D.N.Y. 2012) ........................................................................................70

*PIRG v. Windall*, 51 F.3d 1179 (3d Cir. 1995)…………………………………55

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) ...............................................................................31

*Rite Aid Corp. Wage and Hour Litigation*, 655 F. Supp. 2d 1376
  (J.P.M.L. 2009). ......................................................................................23

*Ross v. Citizens Bank, N.A.*, 667 F.3d 900 (7th Cir. 2012)........................ 61, 62, 70

*Shahriar v. Smith & Wollensky Rest. Group, Inc.*, 659 F.3d 234 (2d Cir. 2011) ....58

*Sherman v. Am. Eagle Express, Inc*, 2012 U.S. Dist. LEXIS 30728
  (E.D. Pa. 2012)................................................................................ 68, 70

*Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003) ..........69

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001)...................................................61

*Urnikis-Negro v. United Am. Family Prop.*, 616 F.3d 665 (7th Cir. 2010) ...........41

*Varacello v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005) ...................57

*Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011) ........................... 16, 61, 62

*Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956 (3d Cir. 1983)……...…... 32, 45

*Walsh v. Pittsburgh Press Co.,* 160 F.R.D. 527 (W.D. Pa. 1994)..........................60

*Weiss v. Mercedes-Benz of N. Am. Inc.*, 899 F. Supp. 1297 (D.N.J. 1995).............44

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984)…………………………64, 65

*Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239 (3d Cir. 1975) ................................65

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910) .................................................30

*Wolfert v. Transamerica Home First Inc.*, 439 F.3d 165 (2d Cir. 2006)................69

*Youngblood v. Family Dollar Stores, Inc.*, 2011 U.S. Dist. LEXIS 115389
   (S.D.N.Y. 2011)........................................................................................... 62, 70

*Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397 (D.N.J. 1990)...................61

## Statutes

28 U.S.C. § 1407 ......................................................................................................7, 23

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*........................................ *passim*

Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. § 333.101, *et seq.* ...........20

## Rules

FED. R. CIV. P. 23 ....................................................................................... 28, 31, 33

FED. R. CIV. P. 30(b)(6)...........................................................................................9

Pennsylvania Rule of Civil Procedure 1028(a)(6).................................................20

## Other Authorities

*Newberg on Class Actions*, (3d ed. 1992).................................................................56

I.      **Introduction**

On behalf of the Settlement Classes preliminarily certified by the Court,

Settlement Class Representative Plaintiffs Shirley Craig, Eddie Ibea, Jose Fermin,

Justin Torres, Jennifer Elliot, Priscilla Thomas, James Fisher, Robert Vasvari,

Daniel Knepper, Ralph Cedano, Donna Garcia, Rene Hough, Sheryl Doyon, Robin

Mazzantini, Lisa Laun, DeShawn Powell, Yvon Witty, Angel Quinones, Thomas

Finley, Larry Eaton, and Karriem Perkins (collectively, "Plaintiffs" or "Settlement

Class Representative Plaintiffs"), and Class Counsel hereby move for final

approval of the class and collective action settlement on the terms set forth in the

Settlement Agreement (the "Settlement"), including an award of counsel fees,

expenses, and incentive payments to the Settlement Class Representative

Plaintiffs.[1]

The $20.9 million Settlement being presented for final approval is an

excellent result for the Classes.  It would resolve a complex series of cases and

permit these proceedings to conclude after nearly four years of litigation.  It would

provide payments to Class Members who will receive, on average, over $1,800, a

fair amount considering that any damages were limited to periods before August

2010.  The Settlement has been diligently implemented since this Court's

---

[1]  This memorandum will use the terms defined in the Settlement Agreement and also used in the Court's Preliminary Approval Order of June 18, 2012 (Doc. 560) ("Preliminary Approval Order").  As used herein, the term "Class" and "Class member" will be used for convenience rather than differentiation between the Settlement Classes.

Preliminary Approval Order (Doc. 560) and overwhelmingly satisfies the standards for final approval, as is set forth in detail herein.

Pursuant to the Court's Preliminary Approval Order, the court-appointed third party Claims Administrator, Garden City Group, Inc. ("Garden City Group"), sent the court-approved notice to Class members.  Counsel has worked closely with Garden City Group during the claims period to ensure timely and accurate administration of the settlement and to address the myriad of requests for information from Class Members.  To date (and the cut-off date for objecting and for opting out is October 3, 2012, so this may change) none of the 7,342 Class Members has objected to the settlement or opted out of the settlement.[2]  Because the settlement is fair and reasonable to the Class and has been administered in accordance with the Preliminary Approval Order, Plaintiffs request, without opposition, final approval of the Settlement, including the requested attorneys' fees and costs and incentive payments to the Settlement Class Representative Plaintiffs.

Further, over the course of the notice and claims period, Class Counsel has received numerous calls, e-mails, and inquiries from Class Members about the Settlement.  Many of the calls pose a wide range of questions – from seeking to pass on address changes or request re-mailings, to questions about dates or what Class members should expect on a going forward basis.  But perhaps the most

---

[2]  If any Class Member(s) object to the settlement after the filing of these papers, Class Counsel will file a supplemental brief responding to the objection(s).

common question has been when the money might be received.  Without exception, the response of the Class members has been positive and Class members have explained that family circumstances, such as job losses from the recession, have made the anticipated receipt of the settlement proceeds particularly valuable. *See* Declaration of Seth R. Lesser in Support of Motion for Final Approval of Class and Collective Action Settlement ("Lesser Decl.") at ¶ 57.

Accordingly, all Plaintiffs' Counsel are pleased and proud to present this Settlement to the Court for final approval.  Class Counsel believes the result obtained is eminently fair and reasonable and will enable the many individuals who took advantage of the Settlement by filing claim forms to receive recompense for the overtime that (Plaintiffs assert) they were wrongfully not paid.  Class Counsel believes that given the risks inherent in further litigation, the Settlement should obtain final approval by this Court.

## II.    **Procedural Background**

As the Court is aware, the Settlement would represent the end of a complex and fiercely litigated series of lawsuits that have involved, including appellate adjudication, virtually the full panoply of events that can occur in cases of this sort short of trial.[3]  In effect, the proposed Settlement is an omnibus settlement that

---

[3] Much of what is set forth in this section of this brief was set out at pages 5-23 of Plaintiffs' memorandum in support of their Motion for Preliminary Approval of Class and Collective Action Settlement (Docket No. 556).  The discussion is reproduced here for the Court's

would, if approved, constitute the end of several years of dogged litigation literally across the country – from Portland, Maine to Portland, Oregon –  in which both sides, believing they were correct, litigated the propriety of Rite Aid's classification of Assistant Store Managers and Co-Managers (collectively "ASMs") as "exempt" from overtime pay requirements under the federal Fair Labor Standards Act and analogous state laws.

Specifically, the Settlement would resolve the fourteen cases that are presently before this Court.  Collectively, these lawsuits involve nationwide claims that were brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq* ("FLSA") and/or under the laws of those states that have state wage and hour statutes analogous to the FLSA, on behalf of Rite Aid's ASMs in nearly every state (excluding California where ASMs were not classified as exempt during the relevant time periods).

The scope of the litigation has involved approximately 4,700 stores.  During the relevant time periods, the front end of Rite Aid's stores have generally been staffed with a Store Manager ("SM") in each store, from zero to multiple ASMs, from zero to multiple Shift Supervisor(s), Cashiers, Stockpersons, and other positions depending on the store.  *See* Lesser Decl. at ¶ 2.  During the relevant time periods, Rite Aid designated Co-Managers and certain ASMs as exempt under the

---

convenience.

FLSA and under the laws of the states that have analogous state wage and hour laws. *Id.* at ¶ 3. Further, with but a small title exception of Co-Manager (as opposed to Assistant Store Manager) and varying rules in some applicable collective bargaining agreements, the structure and rules and policies pertaining to the Class Members were the same across the country (excepting, as noted, California). *Id.*

A.   ***Shirley Craig v. Rite Aid Corp., et al.***

The litigation began with the filing of the *Craig* case in this Court in December 2008, a case that asserted claims under the FLSA on behalf of Rite Aid's ASMs. That case, whose docket has over 550 entries, proceeded through discovery; through this Court's conditional certification of a collective action of the matter pursuant to Section 16(b) of the FLSA in February 2010; through depositions of ASMs and store and corporate employees throughout the country; through the exchange and analysis of hundreds of thousands of pages of documents; and through litigation and briefing regarding multiple other issues including discovery disputes, privileged documents, and motions for summary judgment relating to bankruptcy and merits issues. *See* Lesser Decl. at ¶ 4. There were multiple motions involving disputed aspects of discovery, from the overall scope and timing of discovery to specific discovery disputes, and multiple hearings and motions before the Magistrate Judge. *Id.* In fact, the Magistrate Judge (almost

at least once a month sometimes more often) was called upon to address disputes, provide direction, rule on motions and the like and there were routine telephone and in-person conferences with Magistrate Judge Carlson. *Id*. Plaintiffs' counsel reviewed literally hundreds of thousands of pages of "store level" documents for the opt-in deponents that Rite Aid collected and sent to document storage facilities scattered throughout the country. Lesser Decl. at ¶ 5.

In addition, even when the parties were not before the Court through conferences, arguments or briefing positions, the parties engaged, literally day after day for the past several years, in conferrals about many difficult discovery issues pertaining to collective action certification. *Id*. For electronic discovery matters, for instance, Plaintiffs engaged an expert consultant from OrcaTec to assist with an analysis of Rite Aid's electronic systems in order to determine the most effective and cost efficient way to obtain relevant electronic discovery materials, which entailed multiple systems (including legacy systems) spanning multiple years. Lesser Decl. at ¶ 6. The parties exchanged innumerable letters and emails and sought Court intervention (most often in the *Ibea* matter discussed below, but also in the *Craig* case) concerning these electronic discovery issues. *Id*. As the Court can see, the *Craig* litigation itself – even aside from the other parallel cases, discussed below – has been a lengthy and expensive endeavor for both sides.

Following the conditional certification in *Craig*, additional ASM and Co-Manager cases were filed throughout the country asserting claims on behalf of ASMs and Co-Managers in multiple states. Lesser Decl. at ¶ 7. These were filed in separate courts under specific state laws, and continued to be so filed after the Judicial Panel on Multidistrict Litigation had rejected Plaintiffs' request for centralization of this litigation under 28 U.S.C. § 1407, inasmuch as most plaintiffs preferred to proceed with their own individual state law claims in the federal courts in their states. Some of the state cases were transferred to this Court, upon Rite Aid's motions, but others were not. A summary of the cases follows.

### B.    *Eddie Ibea v. Rite Aid Corp.*

On July 6, 2010, Eddie Ibea filed a lawsuit in the Eastern District of New York alleging that Rite Aid violated the FLSA by failing to pay Co-Managers overtime. Lesser Decl. ¶ 8. By agreement, the case was transferred to the Southern District of New York on July 28, 2011 where, as discussed below, other parallel cases were already pending. *Id.* Upon transfer, the parties engaged in FLSA § 216(b) pre-certification discovery which included, among other things, the depositions of seven Co-Managers as well as 30(b)(6) depositions covering multiple topics. *Id.* On November 14, 2011, Plaintiff filed his motion for conditional certification pursuant to Section 216(b) of the FLSA, and Magistrate Judge Henry B. Pitman granted Plaintiff's motion on December 14, 2011. *Id.* at ¶

9.   Rite Aid objected to Magistrate Pitman's ruling, and the parties briefed the

objections.  District Judge Jed S. Rakoff overruled Rite Aid's objections to

Magistrate Judge Pitman's Order on January 9, 2012.  *Id.*; *see also Ibea v. Rite Aid

Corp.*, 2012 U.S. Dist. LEXIS 4682 (S.D.N.Y. Jan. 6, 2012).  Following the ruling,

the parties litigated many issues, including the appropriateness of any sample and

the sample size for discovery of the opt-ins, multiple protective orders and motions

to compel concerning payroll data for the collective action members, depositions

of corporate witnesses and 30(b)(6) topics, and numerous other discovery issues

that arose during the post-conditional certification discovery phase.  *Id.* at ¶ 10.

Moreover, Plaintiff's counsel reviewed thousands of pages of store-level

documents relating to Plaintiff and the opt-ins in the *Ibea* matter.  *Id*.  There were

approximately twenty Court conferences in this matter alone addressing the

conditional certification motion and the discovery issues.  *Id*.

In addition, the parties fiercely litigated electronic discovery matters relating

to both Rite Aid's and the opt-ins' electronic materials.  Lesser Decl. ¶ 11.  Both

sides engaged electronic discovery consultants to manage the complicated issues

that arose during the process.  *Id*.  The parties exchanged thousands of pages of

electronic materials including various corporate policies and procedures,

communications to the opt-ins' stores in the form of "SYSMs", and electronic

mail.  *Id*.  The parties also hotly litigated the issue of corporate custodians for

additional electronic mail and addressed this matter in multiple court conferences before Magistrate Judge Pitman, both in person and via telephone.  *Id.*

In addition, the parties took the depositions of more than thirty Co-Managers and corporate employees.  Lesser Decl. at ¶ 12.   At the time of the settlement, Plaintiffs planned, and had noticed, ten depositions of corporate witnesses including a FED. R. CIV. P. 30(b)(6) deposition covering multiple topics.  *Id*.  To obtain these depositions, the parties had litigated numerous motions to compel and motions for protective orders that each side had filed.  *Id.*

By virtue of the court's expeditious handling of the scheduling in this case, all discovery would have been required to have been completed by June 8, 2012 to be followed by Defendants' motion for decertification and/or dispositive motion(s); thereafter, final pretrial motions (whether on an individual or collective basis) might have been expected, but, as both sides would acknowledge, there was a substantial likelihood that the *Ibea* litigation would well have found itself shortly put on a pretrial scheduling track, with a trial that could have been starting in a mere few months.

**C.**   ***Jennifer Elliot, Jose Fermin, & Yvon Witty v. Rite Aid Corp., et al.***

On October 31, 2008, Yatrim Indergit filed a Complaint in the Southern District of New York on behalf of himself and all other Store Managers and Assistant Store Managers alleging that Rite Aid violated federal and state law by

failing to pay overtime.  Lesser Decl. at ¶ 13.  On December 31, 2008 and

September 1, 2010, Jose Fermin and Yvon Witty, respectively, filed Complaints

against Rite Aid alleging violations of the New York Labor Law on behalf of

themselves and all others allegedly similarly situated, including, as here relevant,

ASM claims.  *Id.*  On July 18, 2011, in a court conference before Magistrate Judge

Pitman, after issues of conflict of interest had arisen and been addressed, the

parties (including plaintiffs' counsel in *Indergit*, *Fermin* and *Witty*) agreed before

the court to have counsel in *Fermin* and *Witty* continue to represent the ASM

claims, while *Indergit* counsel would represent the SM claims.  *Id*. at ¶ 14.  At the

same time (July 18th), the parties agreed to consolidate the *Witty* case with the

*Fermin* case for all purposes.  *Id.*  On December 14, 2011, Plaintiffs moved to

substitute Jennifer Elliot for Yvon Witty as Plaintiff due to Mr. Witty's personal

situation requiring him to move to Haiti.  *Id.*  The motion to substitute was among

the matters pending at the time that the parties reached a settlement.  *Id.*

Discovery commenced in earnest in 2011, and the parties engaged in pre-

certification discovery covering matters relating to FED. R. CIV. P. 23 certification

issues.  Lesser Decl. at ¶ 15.  Plaintiffs moved to compel a class list of ASMs to

obtain discovery from putative class members, and Magistrate Judge Pitman

granted Plaintiffs' motion on August 10, 2011.  *Id.*  Subsequently, the parties

engaged in 30(b)(6) depositions covering multiple topics and took more than

twenty depositions of ASMs and store level and corporate witnesses across New

York State covering matters relating to whether or not the ASMs are similarly

situated, Rite Aid's corporate policies and procedures, and the nature and scope of

the job duties performed by ASMs.  *Id*.  The parties also engaged in written

discovery including the production of thousands of pages of documents.  *Id*.

On January 23, 2012, Plaintiffs filed a comprehensive motion to certify a

Rule 23 New York Labor Law class of ASMs who Rite Aid classified as exempt

from overtime (a motion that had 41 exhibits, reflecting the scope of the discovery

that had been undertaken); Rite Aid filed its opposition on April 13, 2012; and

Plaintiffs' reply was not yet due at the time the parties reached a settlement.

Lesser Decl. at ¶ 16.

### D.     *James Fisher and Daniel Knepper v. Rite Aid Corp., et al*.

Plaintiff James Fisher originally filed his class action Maryland Wage and

Hour Law ("MWHL") claim ("*Fisher I*") in the United States District Court for the

District of Maryland on July 21, 2009.  Lesser Decl. at ¶ 17.  Rite Aid moved to

dismiss Plaintiff Fisher's claim, arguing that the first-to-file rule mandated that Mr.

Fisher pursue his claim in the Middle District of Pennsylvania, where *Craig v. Rite

Aid Corp*. was pending.  *Id*.  The parties fully briefed Rite Aid's motion to dismiss,

and on June 8, 2010 Judge Bennett dismissed Plaintiff's MWHL claim without

prejudice under the first-to-file-rule. *See Fisher v. Rite Aid Corp*., 2010 U.S. Dist. LEXIS 56383 (D. Md. June 8, 2010).

Plaintiff Fisher subsequently re-filed his Complaint in the federal district court for the Middle District of Pennsylvania. *See Fisher v. Rite Aid Corp*., Civil No. 1:10-cv-01865 (M.D. Pa.) ("*Fisher II*"). On February 16, 2011, the Middle District of Pennsylvania dismissed Plaintiff's complaint without prejudice on the grounds that Plaintiff's MWHL claim was "inherently incompatible" with the FLSA claim he asserted in the *Craig* action as an opt-in. *See Fisher v. Rite Aid Corp*., 2011 U.S. Dist. LEXIS 15375 (M.D. Pa. Feb. 16, 2011). The Court noted that Plaintiff could re-file his MWHL action in state court, a decision that Plaintiff appealed as discussed below. *Id*. at *17.

Plaintiff Fisher re-filed his action in the Baltimore City Circuit Court on April 18, 2011 ("*Fisher III*"). Lesser Decl. at ¶ 17. Defendants removed the action to the United States District Court for the District of Maryland on April 14, 2011. *Id*. Rite Aid moved to dismiss Plaintiff Fisher's claims again, arguing that the law of the case doctrine mandated dismissal. *Id*. Judge Bennett again dismissed Plaintiff Fisher's claims on February 23, 2012. *Id*. Plaintiff appealed Judge Bennett's dismissal to the United States Court of Appeals for the Fourth Circuit. *Id*. Plaintiff thereafter voluntarily dismissed his appeal of *Fisher III* after

the Third Circuit reversed the dismissal of *Fisher II*, a decision which is discussed below. *Id*.

On July 22, 2009, Robert Vasvari filed a Complaint in the Northern District of Ohio alleging that, on behalf of himself and all other Rite Aid ASMs, Rite Aid violated the Ohio Minimum Wage Fairness Act. *Id*. at ¶ 18.   On October 19, 2009, the parties stipulated to transfer this matter to the Middle District of Pennsylvania. *Id*.  While the litigation was pending, Mr. Vasvari passed away, and Plaintiff made an unopposed motion to substitute Daniel Knepper, which the Court granted on December 3, 2010. *Id*.

While *Fisher* and *Knepper* were pending, Rite Aid moved to dismiss the actions based upon a theory referred to as "inherent incompatibility," essentially claiming that Plaintiffs' state law claims were incompatible with their FLSA claims asserted in *Craig*.  Lesser Decl. at ¶ 19.  On February 16, 2011, this Court granted Rite Aid's motion, and Plaintiffs appealed the ruling to the Third Circuit. *Id*. at ¶ 20.  After ordering briefing and holding oral argument, earlier this year, the Third Circuit reversed the order and reinstated the *Fisher* and *Knepper* actions holding that FLSA and state law claims are not inherently incompatible. *Id*. at ¶ 21; *Knepper v. Rite Aid Corp*., 675 F.3d 249 (3d Cir. 2012).  This allowed the *Hough* and *Mazzantini* cases (which were putative state law class actions pending in the Middle District of Pennsylvania that would have arguably been subject to

dismissal pursuant to the inherent incompatibility ruling) to proceed with *Fisher*

and *Knepper* in the Middle District of Pennsylvania. *Id*. Court conferences before

this Court were scheduled at the time that this Settlement was reached.

   **E.    *Sheryl Doyon v. Rite Aid Corp., et al.***

On April 22, 2011, Sheryl Doyon filed a lawsuit alleging, on behalf of

herself and all others similarly situated, that Rite Aid violated the Maine Wage

Payment Statute by failing to pay overtime to ASMs. Lesser Decl. at ¶ 22. On

June 24, 2011, Rite Aid moved to change venue to the Middle District of

Pennsylvania claiming that Plaintiff Doyon was an opt-in in the *Craig* matter and

her Complaint made the same allegations and therefore should be transferred to the

Middle District of Pennsylvania. *Id*. at ¶ 23. Plaintiff opposed the motion noting

that, among other reasons, Ms. Doyon was no longer an opt-in in *Craig* due to the

FLSA statute of limitations. *Id*. Rite Aid withdrew the motion, and discovery

commenced thereafter. *Id*. Plaintiff again made a motion to compel the class list

of ASMs, and Magistrate Judge John Rich granted Plaintiff's motion on November

18, 2011. *Id*. at ¶ 24. Pre-certification discovery followed including 30(b)(6)

depositions covering multiple topics, the depositions of Plaintiff and a Regional

Vice President in charge of Rite Aid's Maine stores. *Id*. Additionally, Plaintiff's

counsel obtained declarations from other Rite Aid Maine ASMs. *Id*. Plaintiff filed

a motion for class certification pursuant to FED. R. CIV. P. 23 on April 19, 2012

while other discovery matters were being litigated including electronic discovery and the planned depositions of the ASMs who offered declarations in support of Plaintiff's motion for class certification.  *Id*.

### F.    *Ralph Cedano & Donna Garcia v. Rite Aid Corp., et al.*

On March 2, 2010, Plaintiff Sandra Zirkel filed a complaint in the federal district court of Oregon on behalf of herself and all other allegedly similarly situated current and former ASMs employed by Rite Aid within the state of Oregon for violation of Oregon's state overtime wage laws.  Lesser Decl. at ¶ 25. An Amended Complaint was filed adding Thrifty Payless, Inc. as a Defendant on March 15, 2010.  *Id*.  Discovery requests were exchanged between the parties in July 2010 and responses were provided in August 2010.  *Id*.  Documents were exchanged in October 2010.  *Id*.

Plaintiff filed an unopposed Motion to file a Second Amended Complaint that was granted, and, on December 15, 2010, a Second Amended Complaint adding Ralph Cedano as a Plaintiff was filed.  Lesser Decl. at ¶ 26.  On December 17, 2010, Sandra Zirkel's claims were dismissed due to her bankruptcy filing in which she did not list this lawsuit as a potential claim.  *Id*.  Shortly thereafter, the parties addressed many issues through motion practice.  *Id*.

On March 4, 2011, Defendants filed a motion for stay asking that the case be stayed until the U.S. Supreme Court issued a ruling in the *Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541, 2545 (2011) ("*Dukes*") case.  Lesser Decl. at ¶ 27.  On

March 7, 2011, Plaintiffs filed a motion to compel to obtain the names and

addresses of all the other current and former Oregon ASMs, Store Managers, and

District Managers.  *Id*.  Shortly thereafter, Defendants filed a motion for protective

order seeking to preclude Plaintiffs from taking the depositions of Store Managers

John Chamberlain and Paul Oleson, and District Manager Denny Horton, because

Defendants asked the court to resolve certain potential ethical considerations

defense counsel had raised regarding representing Store Managers at depositions

when those Store Managers were also opt-in collective action members in the

*Indergit* Store Manager case pending in the Southern District of New York.  *Id*.

After the motion for a protective order was filed, Plaintiffs also filed a motion to

compel the three depositions that had been noticed, as well as the depositions of

the four *Indergit* opt-ins Defendants refused to identify.  *Id*.  On April 26, 2011, the

Oregon court held a hearing to address these motions and granted Plaintiffs'

motions to compel the class list and the depositions.  *Id*.  The court denied

Defendants' motions to stay and for a protective order.  Lesser Decl. at ¶ 27.

Plaintiffs then moved to file a Third Amended Complaint to add Donna Garcia as

plaintiff on August 30, 2011.  *Id*.  The court granted the motion in October 2011.

*Id*.

Plaintiffs sought to take the depositions of non-party putative class members in support of their motion for class certification. Lesser Decl. at ¶ 28. Defendants filed a motion for a protective order on November 15, 2011, seeking to bar Plaintiffs from taking those depositions. *Id.* On December 6, 2011, the Court granted Defendants' motion for a protective order. *Id.* On March 21, 2012, Defendants filed a motion to compel supplemental responses by Donna Garcia to Defendants' Second Request for Production of Documents and Second Set of Interrogatories. Plaintiffs opposed this motion to compel on the grounds that it sought attorney work product. *Id.* The Court denied Defendants' motion to compel on April 23, 2012. *Id.*

Throughout the course of litigating these various motions, the parties engaged in discovery which included written discovery and document production, the depositions of Plaintiff Garcia, a Store Manager, a District Manager, and a Regional Vice President, and discovery of electronically stored information. Lesser Decl. at ¶ 29. After these depositions, the parties exchanged various letters concerning deficiencies in the Defendants' responses to discovery requests. *Id.* The parties were preparing to address these discovery matters with the Court at the time the settlement was reached. *Id.*

### G.     *Justin Torres & Priscilla Thomas v. Rite Aid Corp., et al.*

On June 16, 2009 and November 7, 2009, Justin Torres and Priscilla Thomas, respectively, filed Complaints against Rite Aid alleging violations of the New Jersey Wage and Hour Laws on behalf of themselves and all others similarly situated.  Lesser Decl. at ¶ 30.  On February 9, 2011, the actions were consolidated while pre-certification discovery was ongoing in the *Torres* matter.  *Id*.  In *Torres*, the parties exchanged written discovery, produced documents, and took four depositions of putative class members.  *Id*.  Plaintiffs filed a motion for lead counsel appointment under Federal Rule of Civil Procedure 23(g), and the court denied the motion.  Thereafter, the parties continued with pre-certification discovery, and exchanged documents.  *Id*. at ¶ 31.  Plaintiffs took a Rule 30(b)(6) deposition covering various pre-certification topics.  Plaintiffs made a motion to compel the class list of New Jersey ASMs which was granted on April 24, 2012. *Id*.  The parties engaged in multiple conferrals regarding various discovery issues and deficiencies in responses to discovery requests.  *Id*.  Prior to Plaintiffs' filing a motion for class certification, the parties reached the settlement.

### H.     **The Remaining Cases**

On May 5, 2011, Rene Hough filed a Complaint against Rite Aid in the Western District of Washington alleging, on behalf of herself and all other Rite Aid ASMs, that Rite Aid violated Washington's overtime laws.  Lesser Decl. at ¶

32.  On August 2, 2011, Rite Aid filed a motion to dismiss and/or transfer to the Middle District of Pennsylvania. *Id*.  Plaintiffs opposed the motion. *Id*.  On November 8, 2011, the Court granted the motion to transfer and the case was transferred to the Middle District of Pennsylvania. *Id*.  The case was going to proceed under this Court's direction at the time the settlement was reached. *Id*.

On June 17, 2011, Robin Mazzantini filed a Complaint against Rite Aid in the District of Massachusetts alleging, on behalf of herself and other Rite Aid ASMs, that Rite Aid violated Massachusetts General Laws by failing to pay overtime and all wages owed.  Lesser Decl. at ¶ 33.  On August 11, 2011, Rite Aid moved to transfer the case to the Middle District of Pennsylvania and Plaintiff opposed the motion. *Id*.  Oral argument was held on December 15, 2011 and, at that time, Judge Michael Ponser granted Rite Aid's motion to transfer. *Id*.

While the *Fisher* and *Knepper* appeals were pending in the Third Circuit, the parties filed a joint motion to stay the *Hough* and *Mazzantini* cases since the Third Circuit's decision would determine whether or not the cases could proceed.  Lesser Decl. at ¶ 34.  After the Third Circuit ruled, the parties filed a joint motion to consolidate *Fisher, Hough, Knepper*, and *Mazzantini* for discovery purposes on April 18, 2012. *Id*.

On March 23, 2012, Angel Quinones filed a Complaint in the Southern District of New York against Rite Aid alleging, on behalf of himself and all Co-

Managers, that Rite Aid violated New York Labor Law by failing to pay all wages

due to him and other Co-Managers including overtime.  Lesser Decl. at ¶ 35.  On

May 10, 2012, Plaintiff voluntarily dismissed this action subject to an agreement

with Rite Aid allowing re-filing in the Middle District of Pennsylvania.  *Id*.  On

May 9, 2012, Angel Quinones re-filed his Complaint against Rite Aid which

included allegations that Rite Aid also violated New Jersey Wage and Hour Laws

on behalf of Plaintiff Thomas Finley and New Jersey Co-Managers.  *Id*.

On June 4, 2009, Plaintiffs Lisa Laun and DeShawn Powell ("*Laun*

Plaintiffs") filed a Class Action Complaint in the Philadelphia Court of Common

Pleas alleging that Rite Aid violated the Pennsylvania Minimum Wage Act

("PMWA"), 43 P.S. §§ 333.101, *et seq.* by misclassifying them and other

Pennsylvania ASMs as exempt from receiving overtime premium pay.  Lesser

Decl. at ¶ 36.  On July 28, 2009, Rite Aid filed preliminary objections pursuant to

Pennsylvania Rule of Civil Procedure 1028(a)(6), arguing that another lawsuit

titled *Janice Boyer et al. v. Rite Aid Corporation*, No. 090400455, June Term,

2009[4] was filed in the same court two months prior asserting similar PMWA class

action claims on behalf of Pennsylvania ASMs and Store Managers.  *Id*.  Rite Aid

asked the Court to dismiss the *Laun* Plaintiffs' class allegations and stay their

---

[4]  In October 2009, the parties to the *Boyer* action stipulated to the dismissal of named Plaintiff
Janice Boyer.  Thereafter, the *Boyer* action was re-titled *Larry Eaton, et al. v. Rite Aid of
Pennsylvania, Inc. and Rite Aid Corporation*.  For ease of reference, this action is referred to
herein as the "*Eaton* action."

individual claims pending further order of the court. *Id*. Recognizing that the *Eaton* action was, in fact, filed first, the *Laun* Plaintiffs did not oppose Rite Aid's preliminary objections. *Id*. The *Laun* action remained stayed for over two years. *Id*.

While the *Laun* action was stayed, the *Eaton* action proceeded. However, after Rite Aid filed its response in opposition to Plaintiffs' motion for class certification, on May 6, 2011, the Plaintiffs in *Eaton* filed a "Motion to Withdraw Motion for Class Certification and Discontinue Class Allegations" in which they sought to, *inter alia*, have their PMWA class allegations on behalf of ASMs and Store Managers discontinued.[5] Lesser Decl. at ¶ 37. Then, on November 3, 2011, the Philadelphia Court of Common Pleas entered an order in *Laun* lifting the stay and setting case management deadlines. *Id*. Soon thereafter, the *Laun* Plaintiffs filed a motion for reconsideration asking that their PMWA putative class claims on behalf of ASMs be revived in light of the *Eaton* parties' desire to dismiss the same

---

[5] *Eaton* included a putative class action asserting misclassification claims on behalf of Rite Aid Store Managers in Pennsylvania from April 9, 2006 to present. Andrew Sciola, who is Settlement Class counsel of record in this case, was counsel of record in *Eaton* prior to its consolidation with the *Laun* action. After discovery and briefing on the issue of class certification in *Eaton*, based on his experience in handling such claims, Mr. Sciola concluded that the Pennsylvania Store Manager class action claims were not amenable to class adjudication because of the differences in the job duties they performed and because the evidence demonstrated that Store Managers' primary duty was the management of the stores in which they worked, and sought to withdraw the claims without prejudice. Subsequently, the *Eaton* case was removed, transferred and consolidated with the *Laun* action, which does not include Store Manager claims. Plaintiffs request that the Court dismiss without prejudice the Pennsylvania Store Manager class action claims asserted in *Eaton*. There will be no harm or prejudice to any Store Managers who were potential members of the putative Pennsylvania class action as they are free to pursue their individual claims and the statute of limitations has been tolled.

claims on behalf of ASMs and Store Managers.  *Id*.  On February 27, 2012, the

Philadelphia Court of Common Pleas entered an order consolidating the *Laun* and

*Eaton* actions and making the *Laun* action the lead case.  *Id*.

While the stay in *Laun* was only lifted in the Fall of 2011, the parties

engaged in significant discovery regarding the ASM claims during this period.

Lesser Decl. at ¶ 38.  This included: (i) the *Laun* Plaintiffs responding to Rite Aid's

First Set of Interrogatories and Document Requests; (ii) Rite Aid responding to

Plaintiffs' First Set of Interrogatories and Document Requests which included the

production of over 900 documents that were reviewed by Plaintiffs' counsel; (iii)

the *Laun* Plaintiffs drafting a detailed letter to Rite Aid's counsel addressing

deficiencies in Rite Aid's discovery responses concerning ESI; (iv) Rite Aid's

production of numerous boxes of documents from the *Laun* Plaintiffs' respective

stores; and (v) the *Laun* Plaintiffs serving a Second Set of Interrogatories and

Document Requests on Rite Aid.  *Id*.

On September 24, 2010, Wanda Hadra filed a Complaint against Rite Aid

alleging, on behalf of herself and all others allegedly similarly situated, that Rite

Aid violated the FLSA by failing to pay ASMs all wages due including overtime.

Lesser Decl. at ¶ 39.  The case was filed, in part, to allow late consenting ASMs

from the *Craig* case to pursue a claim against Rite Aid.  *Id*.  On November 29,

2010, the Court granted permission to file late consents in the *Craig* matter, and

the parties agreed to voluntarily dismiss the *Hadra* action on December 1, 2010. *Id*.

The final case, *Robert Lohman v. Rite Aid Corporation, et al.*, was filed on May 17, 2011 and alleged, on behalf of Mr. Lohman and all Rite Aid ASMs, that Rite Aid violated the New Hampshire Protective Legislation Law.  Lesser Decl. at ¶ 40.  Upon review of the law, on December 14, 2011, the parties stipulated to dismissal of the case because the New Hampshire Protective Legislation Law does not apply to employers who are subject to the FLSA.  *Id*.

As noted briefly above, the litigation also entailed a trip to the Judicial Panel on Multidistrict Litigation.  At the time that the seven cases had been filed in Maryland, New Jersey, New York, Ohio and Pennsylvania, Plaintiffs' Lead Counsel, with the respective co-counsel in those cases, filed a motion for centralization under 28 U.S.C. § 1407.  Lesser Decl. ¶ 41.  After briefing, including Rite Aid's opposition, and argument before the Judicial Panel, on December 2, 2009, Plaintiffs was denied, thereby leading to the continued filing and separate litigation of the various cases addressed above.  *Id*. at ¶ 42; *Rite Aid Corp. Wage and Hour Litigation*, 655 F. Supp. 2d 1376 (J.P.M.L. 2009).

\* \* \* \*

In summary, through the discovery process, the parties engaged in eighty-one depositions of ASMs and corporate witnesses and exchanged more than a

million pages of documents covering issues relating to Rite Aid's training

programs, policies and procedures for store operations and merchandising, the

ASMs' job duties and responsibilities, and "store-level" documents that pertain to

the duties being performed and assigned at the local stores.  Lesser Decl. at ¶ 43.

Moreover, Rite Aid produced thousands of pages of electronic documents

including "SYSMs" which are akin to electronic mail sent to the local stores and

the ASMs.  Lesser Decl. at ¶ 44.  The SYSMs provided additional insight into the

day-to-day job duties that ASMs performed.  *Id*. at ¶ 45.  This large scale discovery

put the parties in an exceedingly favorable position to evaluate the merits of their

claims and defenses including the possibilities that certification would be granted

or denied in the state law actions or, alternatively, that the FLSA actions would or

would not be decertified.  *Id*. at ¶ 46.

Moreover, Class Counsel and Settlement Class Counsel are uniquely

informed of the matters in this case inasmuch as they have spoken to a substantial

percentage of the Class Members throughout the United States – literally, as noted,

from coast to coast (from Maine to New York to Pennsylvania to Oregon and other

states) – during this litigation and, accordingly, gained a unsurpassed perspective

of the strengths and weaknesses of their claims against Rite Aid.  Lesser Decl. at ¶

47.  Plaintiffs can unequivocally say – and believe this cannot be gainsaid – that

the proposed Settlement is the product of two fully informed sides negotiating

intensely at arm's length. *See id.* at ¶ 48.  Class Counsel believe that the

Settlement offers a fair and reasonable resolution of the litigation and incorporates

and recognizes the substantial risks each side faced, whether at more trials or upon

appeals, had the litigation continued. *Id.* at ¶ 49.  Furthermore, as noted below, the

reaction from the Settlement Class has been overwhelmingly positive, and Class

Counsel has received numerous messages of thanks from Class Members who

support this settlement. *Id.* at ¶ 50.

As the foregoing summary makes clear, the litigation between the parties to

this Settlement has been intense – several years of day-in-day-out litigation in

multiple federal and state venues.  Lesser Decl. at ¶ 51.  The scope of litigated

matters has been varied and comprehensive – from substantive issues that required

addressing at the Third Circuit, to an MDL petition, to discovery disputes that are

essentially innumerable. *Id.* at ¶ 52.  By the time that the parties agreed to discuss

settlement, there can be no question whatever that both sides were well versed in

the facts, circumstances and law applicable to the disputed issues and had a

comprehensive knowledge of what a potential trial record would look like.  Lesser

Decl. at ¶ 53.

### III.   Summary of the Terms of the Settlement, the Notice That Was Sent and The Classes's Reaction

As set forth at pages 24-29 of the Joint Motion in Support of Preliminary

Approval, the Settlement Agreement provides that Rite Aid will pay up to $20.9

million to the qualified settlement fund in order to resolve the claims as set forth in the Amended Complaint in their entirety.  *See* Settlement Agreement § 6(a).  The qualified settlement fund is being administered by an independent and experienced third-party settlement administrator, Garden City Group.  *See id.* § 9.  The settlement is designed to provide compensation for back pay and other liquidated/statutory damages claims asserted under each applicable law set forth in the lawsuits, both federal and state, in exchange for a release for those claims (the state law claims pursuant to the Rule 23 class and the FLSA claims for those who returned claim forms).  Lesser Decl. at ¶ 54.  It will also cover attorneys' fees and expenses in the amount awarded by the Court; Incentive Awards to the Settlement Class Representative Plaintiffs, also subject to Court approval; and notice and administrative costs.  *Id.* §§ 6, 7, 8, 9(c), 11.

In order to most effectively obtain resolution of all the federal and state wage and hour claims, the Settlement encompasses both the FLSA claims, in the form of a collective action resolution (the "Federal Class"), and the state law claims in the form of a state law Rule 23 class (the "State Law Class"), within which there are differing periods of time covered depending on the varying state statutes of limitations.[6]  *Id.* § 5.  The Court's Preliminary Approval Order certified these classes (for settlement purposes).

---

[6] The Parties submit that, for purposes of this Settlement, the differences in the substantive

According to Rite Aid's records, there were 7,342 putative members of the settlement classes combined, which list was given to Garden City Group.  As the Notices that were sent provided, and as makes equitable sense, each claimant's payment will vary proportionately, as each claimant will receive a share of the net settlement amount based upon his or her weeks worked during the applicable period with a percentage increase for New Jersey (20%) and Pennsylvania (10%) Class Members.  Settlement Agreement at § 11(l).  The estimated average payment to claimants will be approximately $1,845, an amount the parties believe will be – and has been, as discussed below – well-received by the Class.  *Id.*[7]

The Settlement provided that each individual who is a member of either of the Settlement Classes would be sent the Court-approved notice by the Settlement Administrator after the Court's Order granting Preliminary Approval.  Settlement Agreement at § 11.  Upon receipt, in order to receive payment, Class Members had to submit a Consent to Join and Claim Form ("Claim Form") (*id.* § 11(d)).  To date, 1,961 such forms have been received and Class Members have until November 23, 2012 to return Claim Forms.  Lesser Decl. ¶ 55.

---

elements of the claims from state to state are not material except as is otherwise noted.  The parties note that the same structure was approved by the District of New Jersey in similar FLSA/state wage and hour settlements in *Herring v. Hewitt*, No. 3:06-cv-267 (D.N.J.), *Staples, Inc. Wage and Hour Employment Practices Litig.*, 2:08-cv-05746 (D.N.J.), as well as elsewhere. *See, e.g.*, *Nash v. CVS Caremark Corp.*, 1:09-cv-00079 (D.R.I.).

[7] The final weekly pay calculation will depend on such factors as the number of Class members who request exclusion and the awards by the Court being requested by Class Counsel.  It will not materially differ from the estimated $1,845 average.

For those Class Members who returned Claim Forms, Rite Aid will obtain a release of all federal and state law overtime wage and hour claims that could have been asserted against it arising out of these individuals' employment with Rite Aid as an ASM.  Settlement Agreement at §§ 12, 13.  For individuals in the Rule 23 State Law Class who have not timely filed a valid and enforceable request for exclusion (opt-out) – and there are presently none – such state-law claims will be barred by the Settlement once it is final.  *Id.* § 12.  After final Court approval of the Settlement, the Claims Administrator will ensure distribution of the net settlement funds to the claimants pursuant to the terms of the Settlement Agreement.  *Id.* § 11.

Pursuant to the Court's Preliminary Approval Order, the Settlement Administrator undertook to provide the Court-required notice.  Specifically, as the Declaration of Jason Zuena (Exhibit A to Lesser Decl.), a Senior Director of Operations at Garden City Group sets out, in preparation for the receipt of Claims Forms, returned Notices, and other correspondence and questions from Class members, Garden City Group obtained a mailing address, a toll-free telephone number and established a website, www.gcginc.com/cases/riteaid.  Lesser Decl. Ex. A at ¶¶ 2-13.  After obtaining a mailing list of the 7,342 potential Class Members from Rite Aid (and finalizing the language of the claim forms and notices), on August 16, 2012, Notices were mailed to 7,342 Class Members contained in the Class List via first class mail.  *Id.* at ¶ 5.  Thereafter, as instructed

by the Settlement Agreement, Garden City Group also engaged in, among other things, tracing of returned mail, resending the Notice to individuals who were found by skip-tracing, and sending Notice Packets in response to requests for them. *See id.* at ¶¶ 6-10.

The Court-approved notices set forth the material settlement terms; instructions as to how to submit objections to the settlement and appear at the final fairness hearing if they so choose; and instructions as to how to opt-out of the settlement. *See* Preliminary Approval Order (ECF Doc. No. 560) at 11-12. Importantly, unlike in many class action settlement notices, the Notice and Claim Forms sent to Class Members in this case were ***individualized*** to provide each Class Member with the precise payment he/she will receive from the settlement and to explain the number of workweeks upon which the payment amount was based. *See* Lesser Decl. Ex. A at p. 12. In addition, any Class Member who believed the number of workweeks used to calculate his/her payment amount was incorrect could request a workweek review by completing a clearly designated portion of the claim form. *See id.* at 12-13.

On September 21, 2012, pursuant to the Settlement Agreement, the Class Notice was re-mailed via first class mail to 5,427 Settlement Class members who had not submitted a Claim Form or a request for exclusion as of that date. Lesser Decl. Ex. A at ¶ 7. The second Class Notice served as a reminder of the postmark

deadline of November 23, 2012 for Claim Forms and the postmark deadline of October 3, 2012 for requests for exclusions, and also provided the phone number for the Claims Administrator.  *See* Lesser Decl. Ex A at ¶ 7.  Settlement Class Members have until November 23, 2012 to postmark their Claim Forms and Class Counsel expects that the number of valid claims will rise even higher in the weeks between today and November 23, 2012.  *See* Lesser Decl. Ex. A at ¶ 13.

Garden City Group will disburse the Claim Amounts to Class Members within twenty-one days after the Effective Date as defined in the Settlement Agreement.  Settlement Agreement at § 11.  The highest gross value of any individual claim is approximately $9,135 and the average value of any individual claim is approximately $1,845, plainly not an insubstantial amount for these individuals (whose average pay is less than $40,000 a year).  Lesser Decl. Ex. A at ¶ 5 n.2.

## IV.   Standards and Procedures for Final Approval of Class Action Settlements

"Compromises of disputed claims are favored by the courts."  *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 317 (3d Cir. 1998) ("*Prudential II*").  "A 'presumption of fairness' applies in a class action settlement if a court finds that the negotiations were conducted at arm's length, that there was sufficient discovery, that the proponents of settlement are experienced, and that only a small percentage

of class members object." *Benjamin v. Dep't of Pub. Welfare*, 807 F. Supp. 2d 201, 206 (M.D. Pa. Sept. 2, 2011) (Jones, *J.*) (quoting *In Re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004)).  Settlement spares the litigants the uncertainty, delay and expense of a trial, while simultaneously reducing the burden on judicial resources.

Federal Rule of Civil Procedure 23(e) mandates that a class action cannot be settled without court approval:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

*See Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 617 (1997); *Prudential II*, 148 F.3d at 316.  "As the Third Circuit has often stressed, when considering a class settlement the district court must 'act[] as a fiduciary, guarding the claims and rights of the absent class members.'" *Benjamin*, 807 F. Supp. 2d at 206 (quoting *Erheart v. Verizon Wireless,* 609 F.3d 590, 593 (3d Cir. 2010); *see also In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995).  The ultimate determination whether a proposed class action settlement warrants approval resides in the court's discretion.  *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *In re Datatec Systems, Inc. Secs. Litig.*, 2007 WL 4225828, at *2 (D.N.J. Nov. 28, 2007) (hereinafter "*In re Datatec Sys.*") (*citing Girsh v. Jepson*, 521 F.2d 153, 156

(3d Cir. 1975)).  Approval of a settlement is warranted if the settlement is "fair, reasonable, and adequate." *In re Datatec Sys.*, 2007 WL 4225828, at *2 (*citing* FED. R. CIV. P. 23(e); *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001)).

While the Court has discretion in determining whether to approve a settlement, it should be hesitant to substitute its judgment for that of the parties who negotiated the settlement.  *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985).  "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.  They do not decide the merits of the case or resolve unsettled legal questions."  *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) (citation omitted); *Walsh v. Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642-43 (D.N.J. 1983), *aff'd,* 726 F.2d 956 (3d Cir. 1983).  The court may rely on the judgment of experienced counsel and should avoid transforming the settlement hearing into a trial on the merits.  *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974); *accord Benjamin*, 807 F. Supp. 2d at 207. Indeed, as this Court previously held, a presumption of fairness exists where, as here, a settlement has been negotiated at arm's-length through a mediator (former federal Magistrate Judge Joel B. Rosen, a most respected mediator), discovery was sufficient, and the settlement proponents were experienced in similar matters.  *See, e.g., Benjamin*, 807 F. Supp. 2d at 206-07; *see also Larson v. Sprint Nextel*, 2010

WL 234934, at *11 (D.N.J. 2010) (citing *In re Warfarin Antitrust Litig.*, 391 F.3d at 535).

The procedure of providing notice to the class, followed by a hearing to consider approving a class settlement, is now standard practice in this Circuit, as well as throughout the country. *Prudential II*, 148 F.3d at 326-27. This Court previously granted preliminary approval of the Settlement, signifying that the Settlement was in the range of possible approval. However, the ultimate Rule 23 determination is reserved pending the completion of the notice and opt-out process, so the Court can consider input from the class members who will be bound by the final approval order. *See General Motors,* 55 F.3d at 768; *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195 (5th Cir. 1981); *Armstrong v. Board of School Dirs. of the City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980). Now that notice has been provided, the Court may consider final approval.

The Third Circuit has identified nine factors – the *Girsh* factors – that a district court should consider when determining whether a proposed class action settlement warrants approval. *Benjamin*, 807 F. Supp. 2d at 207 (citing *Girsh*, 521 F.2d at 157). These include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining

> the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005).[8]  The

Settlement before the Court in this case falls well within the range of possible

approval, taking into consideration all relevant factors.  Therefore, final approval of

the Settlement should be granted.

### A.    Application of the *Girsh* Factors

#### 1.    Complexity, Expense and Likely Duration of the Litigation

If this litigation were to proceed, significant expense and delay would result,

which likely would not benefit the members of the Class.  This litigation involves

fourteen federal cases, most of which arise from different federal courts, which all

have been consolidated in this Court for purposes of settlement only.  Lesser Decl.

---

[8] The *Girsh* factors are not exhaustive, however, and the Third Circuit has advised that the District court may consider other relevant factors in determining whether final approval should be granted.  *In re AT&T Corp.,* 455 F.3d 160, 165 (3d Cir. 2006) (*citing Prudential II*, 148 F.3d at 323).  These may include, *e.g.:*

> [T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential II,* 148 F.3d at 323.

at ¶ 58.  Significant discovery has occurred in many of the cases as discussed

above, including *Craig, Ibea, Elliot/Fermin/Witty, Torres/Thomas,*

*Cedano/Garcia,* and *Doyon*.  However, even these cases would have required

additional discovery and the resolution of pretrial matters, including, *inter alia*,

class certification or possible decertification motions, dispositive motions, and

motions concerning complex issues such as the proper scope and composition of

representative discovery.  In the other "less advanced" cases (such as, for example,

*Finley*, *Fisher*, *Hough*, *Knepper*, *Laun*, *Mazzantini*, and *Quinones*), class

certification discovery was going to proceed which would include, among other

things, depositions of putative class members and various corporate employees

throughout the United States and document production including expensive

electronic discovery.  *Id*.  These depositions, alone, would have cost both

substantial amounts in time and expenses.  *Id*.  Given the history of this litigation,

it is expected that the courts would need to resolve many discovery disputes which

would require further briefing, necessitating attorney time to research issues and

prepare motions and responses and burden the courts with having to decide

numerous discovery disputes.  *Id*.

Even if one or more classes were certified (which Plaintiffs believe they

could well have obtained and Defendants submit would likely not occur), post-

certification discovery could have been expected to address aspects of the merits of

each ASM's claims such as Rite Aid's defenses relating to its decision to classify ASMs as exempt from overtime in these various states where the cases were pending.  Lesser Decl. at ¶ 59.  Moreover, Rite Aid could have proceeded to summary judgment or other motion practice that would have taken more time and could have been dispositive.  *Id*.  Thereafter, the parties would prepare pretrial submissions (whether on a class or collective or individual basis) – a significant undertaking given the required analysis of more than one million pages worth of documents and deposition testimony from scores of witnesses – and ultimately attempt to try multiple actions in various courts throughout the United States, risking multiple different outcomes.  *Id*.  As Class Counsel knows from experience in the collective action trial against Staples, Inc., involving Sales Managers, six weeks of trial time was necessary which, again, caused delay and a major expense for both sides.  Lesser Decl. at ¶ 60.  And, in addition to the foregoing, appeals would likely occur after any trial, thus further delaying matters. To say that significant party and judicial resources would have been required would constitute a distinct understatement.

The proposed Settlement, on the other hand, removes the risk of additional discovery costs and adverse discovery rulings, the possible rulings as to summary judgment, adjudication of disputed issues of law and any and all pretrial matters, not to mention the redundant costs of multiple trials in various forums, as well as

the risk of individual trials and/or appeals.  The Settlement makes monetary relief available to all Class members in a prompt and efficient manner.  Moreover, it relieves this Court and many others throughout the United States from spending considerable resources necessary to resolve these matters through further litigation. This is the archetype of a situation where a fair and reasonable settlement (which this is) should be approved.[9]

## 2.   The Absence of Objections is Evidence of the Reasonableness of the Settlement

To date, no objections have been received.  Assuming that any objections are made, they will likely not be material in number and this would be an indication of fairness of the settlement.  To date, not a single Class member out of 7,342 has objected.  Lesser Decl. at ¶ 62.  *Careccio v. BMW of North America, LLC*, 2010 U.S. Dist. LEXIS 42063, at *11-12 (D.N.J. April 29, 2010) (Hayden, *J.*) ("Case law in this Circuit holds that a small number of objections is strong evidence that the settlement is fair and reasonable.") (citing cases).  While Class Counsel believed, in negotiating the Settlement, that the settlement payments, averaging $1,845, would be fair and reasonable given the inherent risks of litigation, the reaction of the Settlement Class here underscores the correctness of that belief.  Lesser Decl. at ¶ 61.  It is to be further noted that the amount that

---

[9]   Moreover, because Rite Aid no longer classifies ASMs as overtime-exempt, these are not cases in which class members' potential damages would continue to increase during the pendency of further litigation proceedings.

individuals will receive will be determined by the length of their employment, a reasonable and equitable way to proceed and, in actuality, Class Members were informed of the amounts they were likely to receive in the Class Notice. *Id*. Class Counsel believes that the result is fair and reasonable when considering the difficulty and risks of litigating claims involving alleged misclassification of employees under the executive and administrative exemptions of the FLSA and analogous state laws. *Id*.

When determining the measure of the class' reaction to a settlement, the court must look to the number and "vociferousness" of the objectors. *General Motors*, 55 F.3d at 812; *Benjamin*, 807 F. Supp. 2d at 208. Few (as yet, none) objections and no opt-outs represents a reliable barometer of the overall fairness of the Settlement. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993). This is particularly true in today's world when individuals – sometimes even "professional objectors" – are generally sure to find something to fault, whether valid or not. By way of comparison, in *Lenahan v. Sears, Roebuck & Co.*, 2006 U.S. Dist. LEXIS 60307 (D.N.J. July 6, 2006), out of a 16,252 person class, the Court received 190 opt-outs and 6 objections, yet the Settlement was approved because Judge Chesler viewed those numbers, correlating to approximately 1.2% of the Class for the opt-outs and less than 0.01% of the Class for objections, to show nonetheless that "the reaction of the Class to the Proposed Settlement has

been largely positive.  Such acceptance of the Proposed Settlement is persuasive

evidence of the fairness and adequacy of the Proposed Settlement." *Lenahan*,

2006 U.S. Dist. LEXIS 60307, at *38-39.

### 3.   Stage of the Proceedings and the Amount of Discovery Completed

This factor requires the Court to analyze the stage of the proceedings to

determine "the degree of case development that . . . counsel have accomplished

prior to the settlement." *General Motors*, 55 F.3d at 813.  Moreover, the "parties

must have an 'adequate appreciation of the merits of the case before negotiating.'"

*Benjamin*, 807 F. Supp. 2d at 208 (quoting *id.*).  Essentially, the Court must ensure

that the Settlement is not the product of a quick and uniformed decision-making

process.  This factor is unequivocally satisfied here.  As noted above at 4-25, the

parties have completed a huge amount of discovery (including obtaining experts to

work through complicated electronic discovery issues) for more than three years

and were embarking on what would have been yet additional substantial discovery

(including, specifically, electronic discovery and production, etc.) and briefing at

the time that they agreed to the terms of a settlement.  Lesser Decl. at ¶ 63.  The

parties learned through discovery how this litigation would likely play out and the

strengths and weaknesses that existed on both sides.  *Id*.  While new arguments and

refinements of old arguments might have been anticipated (and ultimately have

occurred), the history of the litigation was such that the parties were, to an unusual

and rare degree, knowledgeable about the case and in a position to make informed decisions. *Id.* That the Settlement was not reached in undue haste is certainly underscored by the fact that the parties ultimately required an in-person mediation session followed by numerous informal settlement discussions between the parties and with the mediator over the course of several months. Lesser Decl. at ¶ 64. After agreeing to the principle terms of the Settlement, negotiations extended for yet another month over the terms of the Settlement Agreement before the Settlement was finalized. *Id.* Thus, this factor weighs in favor of approval.[10]

### 4.    Risks of Establishing Liability and Establishing Damages

The Court must determine whether the proposed Settlement is within a range that experienced attorneys could accept in light of the relevant risks of the litigation. *General Motors*, 55 F.3d at 806. Certainly, the parties here were particularly well-informed about the relative risks of the litigation and, most certainly, Class Counsel and Settlement Class Counsel are experienced attorneys in the areas of wage and hour and complex litigation.

Here, there remained risks for the Class. Risks existed as to certification in the Rule 23 actions and maintaining the FLSA collective action certifications in *Craig* and *Ibea*; risks existed as to the possibility of an adverse ruling after a

---

[10]   Magistrate Judge Carlson, who expertly (and patiently) presided over many discovery conferences and resolved many discovery disputes, certainly can attest to the parties' discovery efforts in the *Craig* case.

summary judgment motion that ASMs were exempt from overtime and therefore not entitled to any damages; risks existed as to the possibility of multiple trials leading to unfavorable outcomes for Plaintiffs; and risks existed even as to upholding any positive Plaintiff verdict through appeal.  Many unsettled questions of law remained – all of which presented risk to Plaintiffs.  These included the unsettled nature of how damages are determined in FLSA cases (as exemplified by a decision of the Seventh Circuit Court of Appeals which upheld a theory of damage calculation, the fluctuating work week, dramatically less favorable to plaintiffs, *Urnikis-Negro v. United Am. Family Prop.*, 616 F.3d 665 (7th Cir. 2010)).  In short, both evidentiarily and as a matter of the kind of issues presented, multiple trials in this case would have involved significant risks to Plaintiffs because of the fact-intensive nature of proving liability under both the FLSA and the state wage and hour laws, considered in the light of the defenses available to Rite Aid.  Substantial risk as to both liability and damages were present, and there further existed significant hurdles for Plaintiffs to overcome under both federal and state law theories of liability.  While Class Counsel believes the Class's claims are meritorious, Class Counsel are experienced and realistic, and understand that the resolution of liability issues, trial, and the inevitable appeal process are inherently uncertain in terms of both outcome and duration.  Thus, this factor also weighs in favor of approval of the settlement.

### 5.      Risk of Maintaining the Class Action Through the Trial

After the Supreme Court's opinion in *Amchem*, 521 U.S. at 620, this factor

"may not be significant" to a court's determination of the approval of a settlement.

*Prudential II*, 148 F.3d at 321.  Particularly because this is a settlement class, "this

factor adds little to the consideration of the fairness of the settlement." *In re Safety*

*Components Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 91 (D.N.J. 2001) (citing *id.*).

However, the Court's decision to certify both the Section 216(b) collective

opt-in settlement class and the Rule 23 settlement class is for settlement purposes

only.  While, in *Craig* and *Ibea*, the Section 216(b) motions were granted, there

was no guaranty that certification would be maintained after the completion of

discovery when Rite Aid moved for decertification.  Similarly, although Plaintiffs

believed Rule 23 certifications were eminently obtainable, Defendants did not, and

there always exists the risk of decertification at a later stage in the litigation, such

as if the class becomes unmanageable – a factor that does not pose a problem in a

settlement class.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 537.

Accordingly, these risks weigh toward settlement.  *Id.*

### 6.      Ability of the Defendants to Withstand Greater Judgment

This *Girsh* factor "is concerned with whether the defendants could withstand

a judgment for an amount significantly greater than the settlement." *Cendant*, 264

F.3d at 240.   This factor is fundamentally irrelevant to the present proceeding. *See*

42

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 538.  However, it is worth noting that the proposed settlement is substantially higher than Rite Aid had long indicated it was prepared to pay to settle the litigation because of, among other things, Rite Aid's position that ASMs were properly classified, its belief that the claims could not properly proceed through trial on a class or collective basis, and its fiscal position.  Lesser Decl. at ¶ 65.

> **7.  Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The fairness of the settlement process and of the Settlement Agreement itself also was shaped by the experience and reputation of counsel, an important factor in final approval of class action settlements.  *See General Motors*, 55 F.3d at 787-88; *Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977); *Benjamin*, 807 F. Supp. 2d at 206-07 (recognizing the "presumption of fairness" when the "proponents of settlement are experienced [counsel]"); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974) ("The recommendation of experienced antitrust counsel is entitled to great weight."); *Fisher Brothers v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("The professional judgment of counsel involved in the litigation is entitled to significant weight.").  This Settlement was specifically negotiated by experienced counsel to meet all the requirements of Rule 23 as discussed in

*Amchem*, and specifically to provide administrative procedures to assure all Class members equal and sufficient due process rights.  Accordingly, the Settlement was not the product of collusive dealings, but, rather, was informed by the vigorous prosecution of the case by the experienced and qualified counsel with the assistance of a former federal Magistrate Judge.  Further, as noted above in the discussion regarding *Girsh* factor one, continued litigation would be complex, expensive, and a burden to court dockets.  *Lake v. First Nat'l Bank*, 900 F. Supp. 726, 732-33 (E.D. Pa. 1995) (expense and duration of litigation are factors to be considered in evaluating the reasonableness of a settlement); *Weiss v. Mercedes-Benz of N. Am. Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) (burden on crowded court dockets to be considered).

There is no reason to doubt the fairness of the proposed Settlement Agreement.  The Settlement was the result of literally months of arm's length negotiations, with the guidance of a well-respected mediator, and between experienced and informed counsel on both sides.  The proposed Settlement Agreement fairly treats all members of the Class, and it does not provide excessive compensation to Counsel (who here are requesting 33 1/3% for both fees and expenses, an amount often sought in such cases).  The $20.9 million Settlement Fund is a substantial result for a wage and hour class of 7,342 individuals and will result in a significant payment to each settlement Class member.  Furthermore,

because the amount each Class member will receive will be proportional to his or her time worked within the applicable statute of limitations, fairness in payments will result.  Those who believed they would have been entitled to significantly more could, of course, have opted out and pursued an independent remedy.

In short, the Settlement here, far from being adequate (which is the standard), represents an excellent result when considered in light of all the relevant factors and risks discussed above.

### B.   The Plan of Distribution of the Settlement Fund is Fair

The "[a]pproval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'"  *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 184 (E.D. Pa. 2000) (citations omitted); *see also Walsh,* 726 F.2d at 964 ("The Court's principal obligation is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.").  The Settlement Agreement provides that Class Counsel will seek reimbursement for expenses and for attorneys' fees of no more than 33 1/3% percent of the Settlement Fund.  Class Counsel also proposes that $7,500 be paid to the original plaintiff (Shirley Craig) to step forward and $5,000 to be paid to each of the other Settlement Class Representatives.  Settlement Agreement at § 8(c).  The settlement fund will also pay the costs of

notice and settlement administration, anticipated to total approximately $332,000.
*See* Lesser Decl. Ex. A at ¶ 14.  The Settlement Fund will also pay state and
federal taxes imposed on Rite Aid as an employer as a result of payments made to
members of the Class under this Settlement Agreement.  Lesser Decl. at ¶ 66.

Class Counsel believes that the Settlement plan is eminently fair, reasonable,
and adequate, permitting payment based upon length of service within the Class.
As noted, in the closest parallel case to which this litigation can be compared, a
nationwide settlement against CVS last year on behalf of CVS ASMs settled for
$34 million, with essentially the same recovery for class members and, in that case,
United States District Court Judge McConnell termed the result "magnificent."
Lesser Decl. ¶ 67.[11]

### C.   Class Counsels' Request for Reimbursement of Expenses Should Be Approved

"Counsel for a class action is entitled to reimbursement of expenses that
were adequately documented and reasonably and appropriately incurred in the
prosecution of the class action."  *In re Datatec Systems*, 2007 WL 4225828, at *9
(quoting *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J.
2001); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 519 (W.D. Pa. 2003)
("There is no doubt that an attorney who has created a common fund for the benefit

---

[11] In the third retail chain drugstore case of which we are aware, *Damassia v. Duane Reade, Inc.,*
No. 04 Civ. 8819 (S.D.N.Y.), the recovery per assistant store manager was substantially less than
in this case or in *Nash.*

of the class is entitled to reimbursement of . . . reasonable litigation expenses from that fund.").

Class Counsel requests reimbursement of expenses in the amount of $273,598.62 to cover costs associated with legal research, discovery, travel, depositions, mediation, meals, transportation, court fees, mailing, postage, and telephone.  *See* Lesser Decl. ¶ 68; *see also* Settlement Agreement at § 7.  These expenses, while substantial, are reasonable given the full scope of this litigation to date, are documented on the books of Class Counsel and Settlement Class Counsel, and are reasonable in relation to the Settlement Fund and should be awarded.  *Id.*; *see In re Pressure Sensitive Labelstock Antitrust Litig.,* 584 F. Supp. 2d 697, 702 (M.D. Pa. Aug. 5, 2008) (providing up to $500,000 to pay for past due and future litigation costs in $8.25 million settlement); *In re Schering-Plough Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 121173, at *16 (D.N.J. Dec. 31, 2009) (approving $1,852,207.61 in expenses).

**D.  Class Counsels' Request for Attorneys' Fees and Costs Is Reasonable and Should be Approved by the Court**

Pursuant to Rule 23(h) and Rule 54(d)(2), Class Counsel seeks an award of attorneys' fees in the amount of $6,693,067.38 ($6,966,666 less $273,598.62 in expenses), or 32% of the common fund created by the Settlement Fund minus expenses.  Lesser Decl. ¶ 68.  Defendants agreed not to oppose Class Counsel's application to be paid up to this amount from the Settlement Fund.  Settlement

Agreement at § 7(a).  The Class was informed of this request in the Notice

materials and (as yet) no Class Member objected.  Lesser Decl. at ¶ 68.

This Court uses the "percentage-of-recovery" method in determining

attorneys' fee awards in common fund cases, subject to a "lodestar/multiplier"

cross-check.  *General Motors,* 55 F.3d at 821; *Rite Aid,* 396 F.3d at 300; *Cendant,*

264 F.3d at 256; *Rent-Way,* 305 F. Supp. 2d at 512-13, 516-17; *Erie County*

*Retirees' Ass'n v. County of Erie,* 192 F. Supp. 2d 369, 377-78 (W.D. Pa. 2002);

*Lazy Oil Corp. v. Watco Corp.*, 95 F. Supp. 2d 322-23 (W.D. Pa. 1997); *Lan v.*

*Ludrof*, 2008 WL 763763, at *18 (W.D. Pa. 2008); *In re Datatec Sys.*, 2007 WL

4225828, at *6.  The Third Circuit has identified several factors that a district court

should consider in determining an award of attorneys' fees.  These factors include:

> (1) the size of the fund created and the number of persons
> benefitted; (2) the presence or absence of substantial objections
> by members of the class to the settlement terms and/or fees
> requested by counsel; (3) the skill and efficiency of the
> attorneys involved; (4) the complexity and duration of the
> litigation; (5) the risk of nonpayment; (6) the amount of time
> devoted to the case by plaintiff's counsel; and (7) the awards in
> similar cases.

*Rite Aid*, 396 F.3d at 301 (citing *Gunter v. Ridgewood Energy Corp*., 223 F.3d 190,

195 n.1 (3d Cir. 2000)).  Each of these factors favors the requested award of

attorneys' fees.

First, the fund created by the Settlement is $20.9 million and the Class

consists of approximately 7,342 individuals, who will receive significant sums of

money as already discussed.  Inasmuch as the result achieved is an important factor

to be considered in assessing the propriety of an attorneys' fee award, this

settlement certainly meets this standard.  *Hensley v. Eckerhart*, 461 U.S. 424, 436

(1983) ("the most critical factor is the degree of success obtained").  In addition,

Class Counsel believes that the representation here has been tenacious and

successful (as evidenced by certifications obtained in *Craig* and *Ibea*) and the

Settlement was reached after overcoming numerous difficulties in a complex area

of law by experienced counsel of considerable repute, as already discussed.

Moreover, in 2009 Rite Aid changed its business practices related to store structure

and now pays ASMs on an hourly basis – one of Class Counsel's goals in bringing

these cases.  Accordingly, this factor is met.  *See Ikon*, 194 F.R.D. at 194 ("[t]he

most significant factor in this case is the quality of representation, as measured by

'the quality of the result achieved, the difficulties faced, the speed and efficiency of

the recovery, the standing, experience, and expertise of the counsel, the skill and

professionalism with which counsel prosecuted the case and the performance and

quality of opposing counsel'") (citation omitted).

Second, as noted above, Class members received notice of the Settlement

terms, including of those terms specifically setting out the amount of attorneys'

fees that Class Counsel are requesting and, as yet, no objections have been

received, but even if objections were received they are unlikely to be material in

number.  *See, e.g., In re AT&T Corp.*, 455 F.3d at 170 (district court did not abuse

discretion in finding that second factor weighed strongly in favor of approval where there were 8 objections out of one million potential class members); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305 ("The District Court did not abuse its discretion in finding the absence of substantial objections by class members to the fee requests weighed in favor of approving the fee request."); *Careccio*, 2010 U.S. Dist. LEXIS 42063, at *22 (one of the "strong indicators" that a fee request was fair and reasonable was that "[n]one of the objector letters mentioned the fee award.").

Third, the Class is represented by experienced counsel who have invested – and this cannot be denied – significant time and resources into the prosecution of this litigation. *See* Lesser Decl. ¶¶ 2-48.  They have served as Class Counsel in numerous class and collective actions, including many significant wage and hour misclassification cases.  *See, e.g.*, Lesser Decl., Exs. B-M (firm resumes of Class and Settlement Class Counsel).  It is fair to say that Class Counsel here include some of the country's leading wage and hour attorneys, counsel that have tried such cases, settled such cases and altogether are recognized for their prowess in this area of law.

Fourth, the duration of this litigation weighs in favor of the award of attorneys' fees.  Counsel have intensely litigated this case for nearly four years and, during that time, as noted, the litigation was not only commenced, discovery

engaged in, class certification briefing done, and an appeal resolved at the Third

Circuit but, in addition, many of the follow-on cases in the federal court either

engaged in or were preparing to go into intense litigation.  The litigation to date

has been complex and involved multiple novel issues.  During the time that the

Settlement Agreement was being negotiated, the parties were literally arguing

before multiple Magistrate Judges (including Magistrate Judge Carlson and

Magistrate Judge Henry Pitman in the Southern District of New York) weekly

about many discovery disputes that arose between the parties.  "The Settlement

saves the parties substantial time and money" and eliminates the possibility that

future relief for the Settlement Classes will not be obtained.  *In re Datatec Sys.*,

2007 WL 4225828, at *7.

Fifth, the risk of nonpayment is significant.  Class Counsel "undertook this

action on a contingent fee basis, assuming a substantial risk that they might not be

compensated for their efforts.  Courts recognize the risk of non-payment as a factor

in considering an award of attorneys' fees."  *Id.* at *7 (citation omitted).  Here,

even if Plaintiffs were successful at trial or through summary judgment, Rite Aid

would likely appeal and, thus, create even more risk that the Class and Class

Counsel would not be compensated for their efforts.

Sixth, Class Counsel and Settlement Class Counsel have committed

14,021.59 hours through the course of the cases comprising this litigation, a

significant expenditure of time, all of which was devoted on a contingency basis with no guarantee of repayment. Lesser Decl. at ¶¶ 81-83. The firms' summaries and descriptions of the work they undertook, as set forth in their declarations, takes approximately 550 pages because of the breadth and scope of the issues in these cases as well as the dedicated efforts of counsel to obtain relief for employees that Plaintiffs' counsel believes were wronged. *See* Lesser Decl. at ¶ 82. Rather than repeating that information at length in this memorandum (which would have added many pages), the Court can see for itself the nature, scope, and depth of what this litigation has entailed. These descriptions, it should be noted, further underscore the tenacity of the defense in this case, all of which Class Counsel and Settlement Class Counsel had to face and overcome to obtain the Settlement now before the Court.

Seventh, the requested percentage of the Settlement Fund – 33 1/3% which in this case includes costs (thereby making the effective requested percentage for attorney's fees of 32%) – is commensurate, if not reasonable and in line with multiple other settlements. While there is no benchmark for fee awards in the Third Circuit, there has been a "range of 19 percent to 45 percent of the settlement fund approved in other litigations." *In re Schering-Plough Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 121173, at *14 (approving 23% fee in $165 million securities settlement); *see General Motors*, 55 F.3d at 822 (setting forth same range); *see*

*also Bradburn v. 3M*, 513 F. Supp. 2d 322, 341-42 (E.D. Pa. May 14, 2007) (approving a 35% award for a $39,750,000 common fund); *In re Corel*, 293 F. Supp. 2d 484, 497-98 (E.D. Pa. Oct. 28, 2003) (approving a 33.3% award for a $7,000,000 common fund); *In re Computron Software, Inc.*, 6. F. Supp. 2d 313, 322-23 (D.N.J. 1998) ("There is no set standard, however, on how to determine a reasonable percentage. Awards utilizing the percentage-of-recovery method can reasonably range from nineteen percent to forty-five percent of a settlement fund . . . . [T]he percentage awarded, should, and generally does, increase commensurate with increased quality of representation.").[12]

Finally the Third Circuit courts also confirm the reasonableness of a percentage of the recovery awarded by cross-checking it with Class Counsel's lodestar. *Rite Aid*, 396 F.3d at 305-06. The lodestar analysis is performed by

---

[12] Numerous courts within the Third Circuit have typically awarded fees of 25% to 33-1/3% of the recovery. *See, e.g., Datatec Sys., Inc. Sec. Litig.*, 2007 WL 4225828, at *9 (awarding 30%); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 133-35 (D.N.J. 2002) (awarding 27%); *In re ATI Techs., Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 7062, at *17-18 (E.D. Pa. Apr. 28, 2003) (awarding 30%); *In re Cell Pathways, Inc., Sec. Litig. II*, 2002 U.S. Dist. LEXIS 18359, at *43-44 (E.D. Pa. Sept. 24, 2002) (awarding 30%); *Ikon*, 194 F.R.D. at 197 (awarding 30%); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp.2d at 735-36 (awarding 25% of $193 million settlement and noting that, according to a Declaration submitted by Professor John C. Coffee, Jr., "[t]he average [fee] percentage of settlements between $100 million and $200 million is 28.1%"). In prior FLSA settlements in this Circuit, fees awarded were 30% in the *Lenahan* case, *see* 2006 U.S. Dist. LEXIS 60307, at *66, and 33% in *Herring v. Hewitt*, No. 3:06-cv-267 (D.N.J.) (*see* Lesser Decl. ¶ at 68, n.4), and while those cases had smaller recoveries, that should not be a reason for reducing the fee here. *See Ikon*, 194 F.R.D. at 197 ("This court respectfully concludes that such an approach [reducing the fee percentage as the total recovery increases] tends to penalize attorneys who recover large settlements. More importantly, it casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizable.").

"multiplying the number of hours reasonably worked on a client's case by a

reasonable hourly billing rate for such services based on the given geographical

area, the nature of the services provided, and the experience of the attorneys." *Id*.

at 305.  If the lodestar multiplier, which is equal to the proposed fee award divided

by the product of the total hours and the billing rate, is large, the award calculated

under the percentage-of-recovery method may be deemed unreasonable, and the

Court may consider reducing the award. *Id*. The lodestar multiplier, however,

"need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's

analysis justifies the award." *Id*. at 307. "The court is not required to scrutinize

every billing record but may, instead, rely on summaries submitted by the

attorneys." *Id.* at 306-07.

Moreover, in calculating lodestar, the various Plaintiffs' Counsel (all of

whom have experience litigating complex class/collective actions throughout the

United States) generally are utilizing the hourly rates used in complex nationwide

class/collective litigation, including the rates they would charge in their home

courts and for and for paying clients.  Plaintiffs' Counsel submit that this approach

is consistent with *Benjamin*, 807 F. Supp. 2d 201, wherein this Court observed that

it is appropriate to deviate from the "forum rate rule" when "the need for 'the

special expertise of counsel from a distant district' is shown or when local counsel

are unwilling to handle the case.'" *Id.* at 211-12 (quoting *PIRG v. Windall*, 51

F.3d 1179, 1186 (3d Cir. 1995)).  For example, here, although one of the law firms on Plaintiffs' legal team (Winebrake & Santillo, LLC) has extensive class/collective action experience and regularly litigates in the Middle District of Pennsylvania, that three-attorney law firm could not possibly have handled this collection of fourteen expensive, time-consuming, and high-risk lawsuits in federal courthouses across the country.  Almost by definition, this type of nationwide class/collective action litigation requires a "team effort," and, in order to succeed, the "team" must include experienced legal counsel who are both experienced in complex class litigation and willing to take on the enormous financial risks of nationwide litigation against well-funded corporations and defense firms.

"Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  *Prudential II*, 148 F.3d at 341 (quoting 3 Herbert Newberg & Alba Conte, *Newberg on Class Actions*, §14.03 at 14-5 (3d ed. 1992); *In re Vicuron Pharma., Inc. Sec. Litig.*, 512 F. Supp. 2d 279, 287 (E.D. Pa 2007); *Rentway*, 305 F. Supp. 2d at 517; *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998).  The request here falls on the low side of the 1x to 4x range.  Here, the total lodestar for Class Counsel and Settlement Class Counsel to date is $5,648,473.33.  *See* Lesser Decl. ¶ 69 (summarizing lodestar totals for Class Counsel and Settlement Class Counsel). Thus Class Counsel's attorneys' fees request of $6,693,067.38 results in a

reasonable multiplier of 1.2.  Lesser Decl. ¶ 69.  Moreover, in all likelihood there will be extensive additional time expended in order to oversee the Settlement and to handle a significant volume of calls from Class members, which will reduce the multiplier further.  *Id.*  In sum, Class Counsel's fee award is well within the range of reasonability, particularly for a case in which the class's reaction has been overwhelmingly positive and no objections to the requested attorneys' fees were made.[13]

Class Counsel respectfully suggests that the counsel fee requested is reasonable in light of the time and labor expended, the magnitude of the litigation, the risks taken in the litigation, the monetary results achieved for the class, and the amount of the fee in proportion to the monetary settlement.

### E.   The Incentive Awards to the Settlement Class Representatives Should Be Approved

The Settlement Agreement provides for an incentive award for the Settlement Class Representatives in the amounts of $7,500 to Shirley Craig and $5,000 to each of the other Settlement Class Representatives.  These individuals stepped forward to place their names on the various complaints that were filed and all provided substantial support to this litigation by fulfilling their commitments in that regard.  They aided Class Counsel when investigating the cases and in

---

[13]   Even if the Court considers the combined lodestar high as a result of hourly rates or hours, the fee award would still fall well within the appropriate lodestar multiplier range.  For example, if Plaintiffs' Counsel's combined lodestar is discounted by 30%, the multiplier would be 1.69, which is well within the acceptable multiplier range.

formulating responses to interrogatories and document requests.  All the Settlement

Class Representatives provided valuable information about their experiences

working for Rite Aid, made themselves available as needed, and stayed in touch

with Class Counsel throughout the litigation.  *See* Lesser Decl. at ¶ 70.

The awards to the Settlement Class Representatives are reasonable and

should be approved.  *Martin v. Foster Wheeler Energy Corp*., 2008 U.S. Dist.

LEXIS 25712, at *23-24 (M.D. Pa. Mar. 31, 2008); *Varacello v. Mass. Mut. Life

Ins. Co.*, 226 F.R.D. 207, 258-29 (D.N.J. 2005); *In re Ins. Brokerage Antitrust

Litig.,* 2007 WL 2916472, at *8 (D.N.J. Oct. 5, 2007).  The law recognizes that it is

appropriate to make modest awards in the range of $1,000 to $30,000 in

recognition of the services that such plaintiffs provide in a successful class action.

*See In re Auto. Refinishing Paint Antitrust Litig.,* 2008 U.S. Dist. LEXIS 569, at

*23 (E.D. Pa. Jan. 3, 2008) (approving a $30,000 award for each class

representative); *Godshall v. Franklin Mint Co*., 2004 WL 2745890, at *4 (E.D. Pa.

Dec. 1, 2004) ($20,000 to each named plaintiff); *Mehling v. New York Life Ins.

Co.*, 248 F.R.D. 455, 467 (E.D. Pa. Mar. 4, 2008) (awards ranging from $7,500 to

$15,000); *Martin*, 2008 U.S. Dist. LEXIS 25712, at *23-24 (awards ranging from

$2,000 to $4,000); *Varacello*, 226 F.R.D. at 258-29 (awards ranging from $1,000

to $10,000); *In re Ins. Brokerage Antitrust Litig*., 2007 WL 2916472, at *8

($10,000 incentive award to each plaintiff, resulting in total payment of $250,000);

*Lazy Oil,* 95 F. Supp. 2d  at 324-25, 345 (incentive awards of $5,000 to $20,000 awarded).  The amounts requested here are reasonable and are not out of proportion to the overall Settlement or the average payout per Class member.[14]

Moreover, as the Second Circuit recently recognized, employees in certain industries often fear bringing FLSA or state wage and hour claims because of retaliation or being "blackballed" in the industry.  *Shahriar v. Smith & Wollensky Rest. Group, Inc.,* 659 F.3d 234, 244 (2d Cir. 2011); *see also Mehling*, 248 F.R.D. at 467 (same).  The Settlement Class Representatives brought these cases in a representative capacity seeking to obtain relief on a class-wide basis for all ASMs and Co-Managers who Plaintiffs allege were improperly misclassified and not paid overtime.  Thus, the Settlement Class Representatives placed their own personal interests aside, despite the real possibilities for retaliation and being "blackballed" in the retail industry, in order to help other ASMs and Co-Managers who could not stand up for themselves since they were either currently employed with Rite Aid or thought that filing a case could prevent them from working for another retailer in the future.  Therefore, for their past and continuing dedication to the Classes, Class Counsel respectfully requests that the incentive awards be approved for the Settlement Class Representatives.

---

[14] This Court has approved enhancement awards in several smaller FLSA collective actions handled by the Winebrake and Santillo firm.  For example, in *Dunn v. National Beef Packing Company, LLC*, 4:07-cv-01599-JEJ, which was approved in May 2008, *see id.* at Doc. 37, the settlement agreement included a $4,000 payment to the named plaintiff. *See id.* at Doc. 36-2, ¶ 5.3.

## V.    Final Certification of the Proposed Class is Appropriate to Resolve All Claims Against Defendants

Pursuant to the Settlement Agreement, and in accordance with the model of other wage and hour misclassification cases, including retail misclassification cases, that counsel have settled in the federal courts, the Parties have stipulated, for settlement purposes only, to the following two classes:[15]

> a.   **FEDERAL CLASS** – The Settlement Class Representatives, and all individuals who as of the date of the Settlement Agreement have filed consents to join any of the Wage-Hour Lawsuits identified in the Settlement Agreement, who worked at Rite Aid as a salaried Assistant Store Manager and/or a salaried Co-Manager during the three-year period prior to the earlier of their becoming a Plaintiff in their respective actions or opting into any of the Wage-Hour Lawsuits; and All other salaried Assistant Store Managers and/or salaried Co-Managers employed by Rite Aid, except in California, from three years prior to the filing of the Second Amended Complaint through the Effective Date.

> b.   **STATE LAW CLASS –** All current and former Rite Aid salaried Assistant Store Managers and/or salaried Co-Managers who are or were employed by Defendant in the following States during the applicable statute of limitations period: Alabama, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Idaho, Indiana, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, and West Virginia.

The benefits of settlement classes are well-recognized.  *See Amchem*, 521 U.S. 591; *Prudential II,* 148 F.3d 283; *Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998).  The Third Circuit has a clear preference for class certification:

---

[15] Plaintiffs previously presented this discussion to the Court in support of their motion for preliminary approval and it is reproduced here with some additions for the Court's convenience.

"The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir. 1985)*; see also Walsh v. Pittsburgh Press Co.,* 160 F.R.D. 527 (W.D. Pa. 1994) (same).  Here, as set forth below, all the elements of Rule 23 are met with respect to the settlement, which, accordingly, merits final settlement certification.[16]

### A.    The Elements of Rule 23(a) are Satisfied in the Present Case

In order for a lawsuit to be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, a named plaintiff must establish each of the four threshold requirements of subsection (a) of the Rule, which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a); *see, e.g., Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3d Cir. 1998); *Prudential II,* 148 F.3d at 308-09.  Here, all four elements are satisfied.

### 1.    Numerosity Under Rule 23(a)(1)

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  While no specific number of class members is

---

[16] The prerequisites for a conditional certification of a FLSA collective action class are often considered to be more lenient than those under Rule 23 of the Federal Rules of Civil Procedure. This memorandum, therefore, will not specifically address the standards for certifying the settlement collective action class.

required to maintain a class action, a class of more than 40 people generally

satisfies the numerosity requirement.  *Stewart v. Abraham*, 275 F.3d 220, 226-27

(3d Cir. 2001); *Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397, 405 (D.N.J.

1990) ("It is proper for the court to accept common sense assumptions in order to

support a finding of numerosity.").  Numerosity is satisfied here, where the

settlement class size is 7,342.  Lesser Decl. Ex. A at ¶ 5.

## 2.      Commonality Under Rule 23(a)(2)

Rule 23(a)(2) requires that there be "questions of law or fact common to the

class."  *See Dukes,* 131 S. Ct. at 2545.  "Their claims must depend upon a common

contention of such a nature that it is capable of classwide resolution -- which

means that determination of its truth or falsity will resolve an issue that is central to

the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2545.

"The commonality requirement will be satisfied if the named plaintiffs share at

least one question of fact or law with the grievances of the prospective class."

*Stewart*, 275 F.3d at 227; *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994); *Ross

v. Citizens Bank, N.A.*, 667 F.3d 900, 908 (7th Cir. 2012) (in context of state wage

and hour off-the-clock claim:  "To satisfy the commonality element, it is enough

for plaintiffs to present just one common claim.") (citing *Dukes,* 131 S. Ct. at

2556).

Commonality exists where the class claims arise "from a 'common nucleus of operative fact' regardless of whether the underlying facts fluctuate over the class period and vary as to individual claimants." *In re Asbestos Sch. Litig.*, 104 F.R.D. 422, 429 (E.D. Pa. 1984). "Factual differences among the claims of the putative class members do not defeat certification." *Baby Neal*, 43 F.3d at 56. As the Seventh Circuit held in *Ross,* "[a]lthough there again might be slight variations in the exact duties that each [assistant bank manager] performs from branch to branch, the [assistant bank managers] maintain a common claim that unofficial company policy compelled them to perform duties for which they should have been entitled to collect overtime." 667 F.3d at 909; *Youngblood v. Family Dollar Stores, Inc.*, 2011 U.S. Dist. LEXIS 115389, at *8 (S.D.N.Y. Oct. 4, 2011) (court certified retail store manager misclassification claim because the "the crux of [the] case is whether . . . company-wide policies, as implemented, violated Plaintiffs' statutory rights"); *Cuevas v. Citizens Fin. Group, Inc.*, 2011 U.S. Dist. LEXIS 155160, at *7 (E.D.N.Y. May 21, 2012) (same) (collecting cases).

For purposes of settlement only, commonality is met here insofar as the claims of the Settlement Class Representatives and the members of the State Law Class are predicated on the core common issue as to whether Rite Aid's classification of them as exempt employees was proper. At least in the settlement context, this is sufficient to meet the Rule 23(a)(2) standard of commonality. *See,*

*e.g.*, Preliminary Approval and Final Approval Orders in *George v. Staples, Inc.*,
2:08-cv-05746 (D.N.J.) (dkt. nos. 116, 128, 131); *see also, e.g., Damassia v.
Duane Reade. Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008) (finding commonality in,
like here, retail drugstore assistant store manager misclassification case because
"disputed questions of law are common to all class members' claims for relief"
including "whether the class member is exempt from [New York Labor Law]
overtime requirements because he or she performs either 'executive' or
'administrative' duties" and whether the company had good faith defenses to
claims); *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309 (D. Mass. 2004)
(holding commonality established where "class members were all employed by
defendant [and c]ommon questions of law include whether [class members] were
properly classified as exempt and whether the defendant acted in bad faith in so
classifying" them).

　　　Here, commonality is met for settlement purposes inasmuch as the claims of
the class representatives and all Class members are predicated on the common
issue as to whether Rite Aid's classification of them as exempt employees was
proper.  In the settlement context, this is the paradigm of a common issue sufficient
to meet the 23(a)(2) standard.

### 3.      Typicality Under Rule 23(a)(3)

Rule 23(a)(3) requires that a representative plaintiff's claims be "typical" of those of other class members.  The commonality and typicality requirements of Rule 23(a) "tend to merge."  *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n.13 (1982).  The requirement of this subdivision of the rule, along with the adequacy of representation requirement set forth in subsection (a)(4), is designed to assure that the interests of unnamed class members will be protected adequately by the named class representative.  *Id.*; *Prudential II,* 148 F.3d at 311; *In re Asbestos School Litig.,* 104 F.R.D. at 429-30.  The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir. 1997).  "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and it is based on the same legal theory."  *Hayworth v. Blondery Robinson & Co.,* 980 F.2d 912, 923 (3d Cir. 1992).  In other words, typicality is demonstrated where a plaintiff can "show that the issues of law or fact he or she shares in common with the class occupy the same degree of centrality to his or her claims as to those of unnamed class members."  *Weiss v. York Hosp.,* 745 F.2d 786, 809-10 (3d Cir. 1984).  Here, this requirement is met for settlement purposes by the proposed

settlement class to the extent that the claims arise from Rite Aid's treatment of salaried ASMs and Co-Managers as exempt wherever they worked in the company. *See*, *e.g.*, *Damassia,* 250 F.R.D. at 158 (finding typicality in retail drugstore assistant manager misclassification case because "all class members' claims, including those of named plaintiffs, are based on the same course of events and legal theory, namely, that Duane Reade's decision to classify its assistant managers as 'exempt' is inconsistent with the requirements of the [New York Labor Law]").

### 4.    Adequacy Under Rule 23(a)(4)

The final requirement of Rule 23(a) is set forth in subsection (a)(4), which requires that "the representative parties will fairly and adequately protect the interests of the class."  The Third Circuit consistently has ruled that the measure of adequate representation is dependent upon two factors, that:

> (a) the plaintiffs' attorney must be qualified, experienced and generally able to conduct the proposed litigation; and
> (b) the plaintiff must not have interests antagonistic to those of the class.

*Weiss,* 745 F.2d at 811 (quoting *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir. 1975)); *see also Prudential II,* 148 F.3d at 312.  These two components are designed to ensure that absentee class members' interests are fully pursued.  The existence of the elements of adequate representation is presumed in the absence of evidence to the contrary.  *In re Asbestos Sch. Litig.,* 104 F.RD. at 430 (citing *Lewis*

*v. Curtis,* 671 F.2d 779 (3d Cir. 1982)); *Cook v. Rockwell Int'l Corp.,* 151 F.RD.

378, 386 (D. Colo. 1993).

Adequacy is easily met here.  As noted, Plaintiffs' attorneys, Class and

Settlement Class Counsel, are experienced and competent in complex litigation and

have an established track record in employment law, including, specifically, wage

and hour cases.  *See* Lesser Decl., Exs. B-M (firm resumes attached to firm

declarations).  Lead counsel, the Klafter Olsen & Lesser LLP firm, among other

things, served as trial counsel in the *Stillman v. Staples, Inc.* FLSA

misclassification collective action trial which resulted in a verdict for plaintiffs, a

group of assistant store managers at Staples, and this year successfully obtained a

collective action verdict in an arbitration, thereby having been successful on behalf

of two FLSA collective actions which proceeded to trial/hearing.  In turn, the

Settlement Class representatives have no interests that are antagonistic to the Class

and they have demonstrated their allegiance to the Class throughout this litigation.

## B.    The Requirements of Rule 23(b)(3) Are Met in the Settlement Context

This motion seeks final certification of classes for settlement purposes only.

The requirements for a certifying a settlement class under (b)(3) are lessened

compared to a litigation class.  *See Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671

(S.D. Fla. 2006) ("because a settlement class action obviates a trial, the [trial] court

judge deciding whether to certify a settlement class action 'need not inquire

whether the case, if tried, would present intractable management problems'")

(quoting *Amchem*, 521 U.S. at 620).  Even if the Court were to analyze the

requirements of Rule 23(b)(3), Plaintiffs submit that the proposed State Law Class

also meets the requirements of Rule 23(b)(3) for settlement purposes.

Under Rule 23(b)(3), a class action may be maintained if:

> the court finds that the questions of law or fact common to the
> members of the class predominate over any questions affecting
> only individual members, and that a class action is superior to
> other available methods for the fair and efficient adjudication of
> the controversy. The matters pertinent to the findings include:
> (A) the interest of members of the class in individually
> controlling the prosecution or defense of separate actions; (B)
> the extent and nature of any litigation concerning the
> controversy already commenced by or against members of the
> class; (C) the desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; (D) the
> difficulties likely to be encountered in the management of a
> class action.

FED. R. CIV. P. 23(b)(3).

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521

U.S. at 623.  Although Rule 23(b)(3) requires that common issues of law and fact

predominate, it does not require that there be an absence of any individual issues.

*In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 344 (E.D. Pa. 1976).  The Court

must find that "the group for which certification is sought seeks to remedy a

common legal grievance." *Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, 348-

49 (N.D. Ill. 1978); *Dietrich v. Bauer,* 192 F.R.D. 119, 127 (S.D.N.Y. 2000) (in

determining whether common issues of fact predominate, "a court's inquiry is

directed primarily toward whether the issue of liability is common to members of

the class"). Moreover, Rule 23(b)(3) does not require that all questions of law or

fact be common. *See In re Telectronics Pacing Sys.,* 172 F.R.D. 271, 287-88 (S.D.

Ohio 1997). In this regard, courts generally focus on the liability issues, and if

these issues are common to the class, common questions may be held to

predominate over individual questions. *See id.* "Plaintiffs' burden is not to prove

each element of their claim, but to show each element is capable of proof through

common evidence." *Sherman v. Am. Eagle Express, Inc*, 2012 U.S. Dist. LEXIS

30728, at *30 (E.D. Pa. Mar. 8, 2012).

In this settlement context, common questions of law and fact predominate.

All of Plaintiffs' claims arise out of Plaintiffs' contentions that (1) there are

corporate-wide policies which define the roles and describe ASMs' duties and

responsibilities, (2) the job duties of ASMs include non-exempt duties such as

stocking shelves, unloading the delivery truck, operating the cash register, and

cleaning the store, and (3) Rite Aid classified all ASMs as exempt from the

overtime requirements of federal and state laws during the relevant time period.

Plaintiffs maintain that for settlement purposes this presents common operative

facts and common questions of law which predominate over any factual variations

in the application of the classification and compensation policies to individual ASMs nationwide.[17]   These common questions of law and fact include, without limitation: whether the duties performed by ASMs are non-exempt duties under the FLSA and applicable state laws and whether Rite Aid has violated the FLSA and applicable state wage and hour laws by classifying ASMs as exempt during the relevant time period.   This suffices, for purposes of a settlement class, to present a common predominance of issues and it is for this reason that courts certify such cases (whether for settlement or litigation).   *See, e.g.*, *Damassia*, 250 F.R.D. at 160 (citing numerous such cases and noting, "[m]oreover, to the extent that there are differences, there is no evidence that they are of such a magnitude as to cause individual issues to predominate.   Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures

---

[17]   Many of the state law claims are brought under statutes that impose liability in a similar manner to the federal FLSA. Two states' wage laws (Pennsylvania and New Jersey) have standards of liability and remedies different from the standards and remedies that apply under the FLSA and these two states have been treated differently in this Settlement.   The differing state law claims can fairly be viewed as not so materially different as to overshadow the similarities, and thus the settlement should be approved.   *See Wolfert v. Transamerica Home First Inc.*, 439 F.3d 165 (2d Cir. 2006) (setting forth standard of materiality of differences).   For instance, courts routinely recognize that differences in states' laws do not militate against settling nationwide cases in such settings as consumer laws notwithstanding the divergence in state uniform and deceptive acts and practices statutes.   *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 528-29 ("DuPont's alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability."); *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 n.9 (1st Cir. 2003); *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) ("Given the settlement, no one need draw fine lines among state-law theories of relief…."); *Prudential II*, 148 F.3d at 314 (approving certification of a nationwide consumer fraud class action citing *Amchem*); *Hanlon*, 150 F.3d at 1023.

and policies, district courts have routinely certified classes of employees

challenging their classification as exempt, despite arguments about

'individualized' differences in job responsibilities."); *see generally Ross*, 667 F.3d

900; *Sherman*, 2012 U.S. Dist. LEXIS 30728; *Cuevas*, 2011 U.S. Dist. LEXIS

155160; *Youngblood*, 2011 U.S. Dist. LEXIS 115389; *Morris v. Affinity Health*

*Plan, Inc.*, 2012 U.S. Dist. LEXIS 64650 (S.D.N.Y. 2012); *Espinoza v. 953*

*Assocs. LLC*, 2011 U.S. Dist. LEXIS 132098 (S.D.N.Y. 2011); *Han v. Sterling*

*Nat. Mortg. Co., Inc.*, 2011 U.S. Dist. LEXIS 103453 (E.D.N.Y. 2011).

Plaintiffs also believe that superiority is met because this settlement will

resolve the pending ASM and Co-Manager lawsuits against Rite Aid in a single,

consolidated proceeding – obviating the need for multiple trials in multiple

transferee venues – and, given the Plaintiffs' contentions regarding commonality

of claims, there would be little or no interest for each class member to proceed

with his or her own cases.  Indeed, the plan of distribution here treats all equitably

by providing payments based upon length of employment with exceptions only for

New Jersey and Pennsylvania Class Members who will receive a 20% and 10%

increase, respectively, due to, among other reasons, the arguably more favorable

laws in those jurisdictions for employees.  Settlement Agreement at § 11(l).  This

distribution plan is a distribution that makes particular sense in a case such as this

wherein Plaintiffs' testimony concerning the number of hours of overtime worked

each week was approximately five hours per workweek.  Accordingly, strictly for the purposes of settlement, the Parties agree that individual variations in the type or magnitude of damage suffered by individual class members should not affect predominance, as the Settlement Class Representatives' position is that they have suffered the same type of damages – and seek the same type of relief – as all members of the proposed class.

Finally, Plaintiffs' position is that resolution of this litigation by class settlement is superior to the individual adjudication of class members' claims for compensatory relief.  The Settlement provides the Settlement Classes with an ability to obtain prompt, predictable and certain relief, whereas individualized litigation carries with it great uncertainty, risk and costs, and provides no guarantee that any injured Settlement Class Member will obtain necessary and timely relief at the conclusion of the litigation process.  Settlement also would relieve judicial burdens that would be caused by adjudication of the same issues in what could be more than a dozen separate trials, including trials in each of the lawsuits being settled herein.  The Settlement prevents the delay, expense, and risk that would occur in such a situation.

Accordingly, strictly for purposes of the settlement posture in which the case now stands, the Settlement Classes are appropriate and certification of the proposed Classes are appropriate for settlement purposes only.

## VI.   <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, for an Award of Expenses and Attorneys' Fess, and for Approval of Incentive Awards to the Settlement Class Representatives should be granted in its entirety.

Dated: September 24, 2012                         Respectfully Submitted,

<div style="margin-left:40%">

s/ Seth R. Lesser_____
Seth R. Lesser
Fran L. Rudich
Michael J. Palitz
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10573
Telephone:  (914) 934-9200

Peter Winebrake
Andrew Santillo
Mark Gottesfeld
WINEBRAKE & SANTILLO, LLC
Twining Office Center, Suite 211
715 Twining Road
Dresher, Pennsylvania 19025
Telephone: (215) 884-2491

Marc Hepworth
David Roth
Charles Gershbaum
HEPWORTH GERSHBAUM &
ROTH PLLC
192 Lexington Avenue, Suite 802
New York, New York 10016
Telephone:  (212) 545-1199

</div>

Gary E. Mason
Nicholas A. Migliaccio
WHITFIELD BRYSON & MASON LLP
1625 Massachusetts Avenue, NW
Suite 605
Washington D.C. 20036
Telephone: (202) 429-2290

Michael A. Josephson
FIBICH, HAMPTON & LEEBORN, LLP
1150 Bissonnet
Houston, Texas 77005
Telephone: (713) 751-0025

Robert E. DeRose
BARKAN MEIZLISH HANDELMAN
GOODIN DEROSE WENTZ LLP
250 E. Broad Street, 10th Floor
Columbus, Ohio 43215
Telephone: (614) 221-4221

Steve Larson
Yoona Park
STOLL BERNE LOKTING &
SHLACHTER P.C.
Suite 500
209 SW Oak Street
Portland, Oregon 97204
Telephone: (503) 227-1600

Alexandra Warren
CUNEO GILBERT & LADUCA, LLP
106-A S. Columbus Street
Alexandria, Virginia 22314
Telephone: (202) 789-3960

Richard O'Meara
Nicole Bradick
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785

Portland, Maine 04104-5085
Telephone:  (207) 773-5651

Andrew J. Sciolla
POGUST BRASLOW &
MILLROOD, LLC
Eight Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone: (610) 941-4204

Robert J. Drexler, Jr.
KHORRAMI, LLP
444 South Flower Street
Los Angeles, California 90071
Telephone:  (213) 596-6000

Bradley Berger
BERGER ATTORNEY, P.C.
321 Broadway
New York, New York 10605
Telephone:  (800) 529-4444

**Attorneys for Plaintiffs and
Settlement Classes**