IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------X

SHIRLEY CRAIG, Individually and on     :
Behalf of All Other Persons Similarly Situated,     :
    :   No. 4:08-cv-2317(JEJ)
                  Plaintiffs,     :
    :
       -against-     :
    :
RITE AID CORPORATION and ECKERD     :
CORPORATION d/b/a RITE AID,     :
    :
                  Defendants.     :

-------------------------------------------------------------X

**DECLARATION OF SETH R. LESSER IN SUPPORT OF
UNOPPOSED MOTION FOR FINAL APPROVAL, FOR AN AWARD OF
EXPENSES AND ATTORNEYS' FEES, AND FOR APPROVAL OF
INCENTIVE AWARDS TO THE REPRESENTATIVE PLAINTIFFS**

SETH R. LESSER, an attorney admitted *pro hac vice*, declares, under penalty of perjury that:

1.      I am a partner in Klafter Olsen & Lesser LLP, who is, with other counsel, counsel for the Plaintiffs and Settlement Class Representatives Shirley Craig, Eddie Ibea, Jose Fermin, Justin Torres, Jennifer Elliot, Priscilla Thomas, James Fisher, Robert Vasvari, Daniel Knepper, Ralph Cedano, Donna Garcia, Rene Hough, Sheryl Doyon, Robin Mazzantini, Lisa Laun, DeShawn Powell, Yvon Witty, Angel Quinones, Thomas Finley, Larry Eaton, and Karriem Perkins (collectively, "Plaintiffs" or "Settlement Class Representatives"), who are the Plaintiffs in the fourteen cases that are presently before this Court.  My firm, by agreement with the

other counsel, has served as Lead Class Counsel in these matters.  I am fully familiar with the facts and circumstances set forth herein, and I make this Declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Settlement, which motion includes final approval of the settlement, as well as Class Counsel's requests for an award of fees and costs and for incentive awards to the Settlement Class Representatives.  This declaration will use the terms defined in the Settlement Agreement and also used in the Court's Preliminary Approval Order of June 18, 2012 (Docket No. 560) ("Preliminary Approval Order").   As used herein, the term "Class" and "Class member" will be used for convenience rather than differentiation between the Settlement Classes.

2.     The scope of the litigation has involved approximately 4,700 stores.  During the relevant time periods, the front end of Rite Aid's stores have generally been staffed with a Store Manager ("SM") in each store, from zero to multiple Assistant Store Managers ("ASMs"), from zero to multiple Shift Supervisor(s), Cashiers, Stockpersons and other positions depending on the store.[1]

3.     During the relevant time periods, Rite Aid designated Co-Managers and certain ASMs as exempt under the FLSA and under the laws

---

[1]  As with the memorandum in support of the present motion, much of the history of the litigation is in this declaration was previously put before the Court in ECF Docket No. 557 in my declaration in support of preliminary approval.

of the states that have analogous state wage and hour laws.  Further, with but a small title exception of Co-Manager (as opposed to Assistant Store Manager), the structure and rules and policies directing the Class Members were the same across the country (excepting California, the Assistant Store Managers who are not part of this litigation).

4.     This litigation began with the filing of the *Craig* case in this Court in December 2008, a case that asserted claims under the FLSA on behalf of Rite Aid's ASMs.  That case, whose docket has over 550 entries, proceeded through discovery; through this Court's conditional certification of a collective action of the matter pursuant to Section 16(b) of the FLSA in February 2010; through depositions of ASMs and corporate employees throughout the country; through exchange and analysis of hundreds of thousands of pages of documents; and through litigation and briefing regarding multiple other issues including discovery disputes, privileged documents, motions for summary judgment relating to bankruptcy and merits issues.  There were multiple motions involving disputed aspects of discovery, from the overall scope and timing of discovery to specific discovery disputes, and multiple hearings and motions before the Magistrate Judge.  The Magistrate Judge (almost at least once a month, sometimes more often) was called upon to address disputes, provide direction, rule on

motions and the like and there were routine telephone and in-person conferences with Magistrate Judge Carlson.

5.     In addition to what was formally produced, Plaintiffs' counsel also reviewed literally hundreds of thousands of pages of "store level" documents for the opt-in deponents that Rite Aid collected and sent to document storage facilities scattered throughout the country.  In addition, even when the parties were not before the Court through conferences, arguments or briefing positions, the parties engaged, literally day after day for the past several years, in conferrals about many difficult discovery issues pertaining to collective action certification.

6.     For electronic discovery matters, for instance, Plaintiffs engaged an expert consultant from OrcaTec to assist with an analysis of Rite Aid's electronic systems in order to determine the most effective and cost efficient way to obtain relevant electronic discovery materials, which entailed multiple systems (including legacy systems) spanning multiple years.  The parties exchanged innumerable letters and emails and sought Court intervention (most often in the *Ibea* matter discussed below, but also in the *Craig* case) concerning these electronic discovery issues.

7.     Following the conditional certification in *Craig*, additional ASM and Co-Manager cases were filed throughout the country asserting claims on behalf of ASMs and Co-Managers in multiple states.

8.      On July 6, 2010, Eddie Ibea filed a lawsuit in the Eastern

District of New York alleging that Rite Aid violated the FLSA by failing to

pay Co-Managers overtime.  By agreement, the case was transferred to the

Southern District of New York on July 28, 2011 where, as discussed below,

other parallel cases were already pending.  Upon transfer, the parties

engaged in FLSA § 216(b) pre-certification discovery which included,

among other things, the depositions of seven Co-Managers as well as

30(b)(6) depositions covering multiple topics.

9.      On November 14, 2011, Plaintiff filed his motion for

conditional certification pursuant to Section 216(b) of the FLSA, and

Magistrate Judge Henry B. Pitman granted Plaintiff's motion on December

14, 2011.  Rite Aid objected to Magistrate Pitman's ruling, and the parties

briefed the objections.  District Judge Jed S. Rakoff overruled Rite Aid's

objections to Magistrate Judge Pitman's Order on January 9, 2012.

10.     Following the ruling, the parties litigated many issues,

including the appropriateness of any sample and the sample size for

discovery of the opt-ins, multiple protective orders and motions to compel

concerning payroll data for the collective action members, depositions of

corporate witnesses and 30(b)(6) topics, and numerous other discovery

issues that arose during the post-conditional certification discovery phase.

Moreover, Plaintiff's counsel reviewed thousands of pages of store-level

documents relating to Plaintiff and the opt-ins in the *Ibea* matter. There were approximately twenty Court conferences in this matter alone addressing the conditional certification motion and the discovery issues.

11. In addition, the parties fiercely litigated electronic discovery matters relating to both Rite Aid's and the opt-ins' electronic materials. Both sides engaged electronic discovery consultants to manage the complicated issues that arose during the process. The parties exchanged thousands of pages of electronic materials including various corporate policies and procedures, communications to the opt-ins' stores in the form of "SYSMs", and electronic mail. The parties also hotly litigated the issue of corporate custodians for additional electronic mail and addressed this matter in multiple court conferences before Magistrate Judge Pitman, both in person and via telephone.

12. In addition, the parties took the depositions of more than thirty Co-Managers and corporate employees. At the time of the settlement, Plaintiffs planned, and had noticed, ten more depositions of corporate witnesses including a FED. R. CIV. P. 30(b)(6) deposition covering multiple topics. To obtain these depositions, the parties had litigated numerous motions to compel and motions for protective orders that each side had filed.

13. On October 31, 2008, Yatrim Indergit filed a Complaint in the Southern District of New York on behalf of himself and all other Store

Managers and Assistant Store Managers alleging that Rite Aid violated federal and state law by failing to pay overtime. On December 31, 2008 and September 1, 2010, Jose Fermin and Yvon Witty, respectively, filed Complaints against Rite Aid alleging violations of the New York Labor Law on behalf of themselves and all others allegedly similarly situated, including, as here relevant, ASM claims.

14.     On July 18, 2011, in a court conference before Magistrate Judge Henry Pitman, after issues of conflict of interest had arisen and been addressed before the court between the claims being asserted for SMs and ASMs, the parties (including plaintiffs' counsel in *Indergit*, *Fermin* and *Witty*) agreed before the court to have counsel in *Fermin* and *Witty* continue to represent the ASM claims, while *Indergit* counsel would represent the SM claims.  At the same time (July 18th), the parties agreed to consolidate the *Witty* case with the *Fermin* case for all purposes.  On December 14, 2011, Plaintiffs moved to substitute Jennifer Elliot for Yvon Witty as Plaintiff due to Mr. Witty's personal situation requiring him to move to Haiti.  The motion to substitute was among the matters pending at the time that the parties reached a settlement.

15.     Discovery in *Elliot/Fermin/Witty* commenced in earnest in 2011, and the parties engaged in pre-certification discovery covering matters relating to FED. R. CIV. P. 23 certification issues.  Plaintiffs moved to compel

a class list of ASMs to obtain discovery from putative class members, and

Magistrate Judge Pitman granted Plaintiffs' motion on August 10, 2011.

Subsequently, the parties engaged in 30(b)(6) depositions covering multiple

topics and took more than twenty depositions of ASMs and corporate

witnesses across New York State covering matters relating to whether or not

the ASMs are similarly situated, Rite Aid's corporate policies and

procedures, and the nature and scope of the job duties that ASMs actually

perform.  The parties also engaged in written discovery including the

production of thousands of pages of documents.

16.    On January 23, 2012, Plaintiffs filed a comprehensive motion to

certify a Rule 23 New York Labor Law class of ASMs who Rite Aid

classified as exempt from overtime (a motion that had 41 exhibits, reflecting

the scope of the discovery that had been undertaken); Rite Aid filed its

opposition on April 13, 2012; and Plaintiffs' reply was not yet due at the

time the parties reached a settlement.

17.    Plaintiff James Fisher originally filed his class action Maryland

Wage and Hour Law ("MWHL") claim ("*Fisher I*") in the United States

District Court for the District of Maryland on July 21, 2009.  Rite Aid

moved to dismiss Plaintiff Fisher's claim, arguing that the first-to-file rule

mandated that Mr. Fisher pursue his claim in the Middle District of

Pennsylvania, where *Craig v. Rite Aid Corp*. was pending.  The parties fully

briefed Rite Aid's motion to dismiss, and on June 8, 2010 Judge Bennett dismissed Plaintiff's MWHL claim without prejudice under the first-to-file-rule.  Plaintiff Fisher subsequently re-filed his Complaint in the federal district court for the Middle District of Pennsylvania.  On February 16, 2011, this Court dismissed Plaintiff's complaint without prejudice on the grounds that Plaintiff's MWHL claim was "inherently incompatible" with the FLSA claim he asserted in the *Craig* action as an opt-in.  The Court noted that Plaintiff could re-file his MWHL action in state court, a decision that Plaintiff appealed as discussed below.  Plaintiff Fisher re-filed his action in the Baltimore City Circuit Court on April 18, 2011 ("*Fisher III*").  Defendants removed the action to United States District Court for the District of Maryland on April 14, 2011.  Rite Aid moved to dismiss Plaintiff Fisher's claims again, arguing that the law of the case doctrine mandated dismissal.  Judge Bennett again dismissed Plaintiff Fisher's claims on February 23, 2012.  Plaintiff appealed Judge Bennett's dismissal to the United States Court of Appeals for the Fourth Circuit.  Plaintiff thereafter voluntarily dismissed his appeal of *Fisher III* after the Third Circuit reversed the dismissal of *Fisher II*.

18.    On July 22, 2009, Robert Vasvari filed a Complaint in the Northern District of Ohio alleging that, on behalf of himself and all other Rite Aid ASMs, Rite Aid violated the Ohio Minimum Wage Fairness Act.

On October 19, 2009, the parties stipulated to transfer this matter to the

Middle District of Pennsylvania.  While the litigation was pending, Mr.

Vasvari passed away, and Plaintiff made an unopposed motion to substitute

Daniel Knepper, which the Court granted on December 3, 2010.

19.     While *Fisher* and *Knepper* were pending, Rite Aid moved to

dismiss the actions based upon "inherent incompatibility," essentially

claiming that Plaintiffs' state law claims were incompatible with their FLSA

claims asserted in *Craig*.

20.     On February 16, 2011, this Court granted Rite Aid's motion,

and Plaintiffs appealed the ruling to the Third Circuit.

21.     After ordering briefing and holding oral argument, earlier this

year, the Third Circuit reversed the order and reinstated the *Fisher* and

*Knepper* actions holding that FLSA and state law claims are not inherently

incompatible.  This allowed the *Hough* and *Mazzantini* cases (which were

putative state law class actions pending in the Middle District of

Pennsylvania that would have arguably been subject to dismissal pursuant to

the inherent incompatibility ruling) to proceed with *Fisher* and *Knepper* in

the Middle District of Pennsylvania.

22.     On April 22, 2011, Sheryl Doyon filed a lawsuit alleging, on

behalf of herself and all others similarly situated, that Rite Aid violated the

Maine Wage Payment Statute by failing to pay overtime to ASMs.

23. On June 24, 2011, Rite Aid moved to change venue to the Middle District of Pennsylvania claiming that Plaintiff Doyon was an opt-in in the *Craig* matter and her Complaint made the same allegations and therefore should be transferred to the Middle District of Pennsylvania. Plaintiff opposed the motion noting that, among other reasons, Ms. Doyon was no longer an opt-in in *Craig* due to the FLSA statute of limitations. Rite Aid withdrew the motion, and discovery commenced thereafter.

24. Plaintiff again made a motion to compel the class list of ASMs, and Magistrate Judge John Rich granted Plaintiff's motion on November 18, 2011. Pre-certification discovery followed including 30(b)(6) depositions covering multiple topics, the depositions of Plaintiff and a Regional Vice President in charge of Rite Aid's Maine stores. Additionally, Plaintiff's counsel obtained the declarations from other Rite Aid Maine ASMs. Plaintiff filed a motion for class certification pursuant to FED. R. CIV. P. 23 on April 19, 2012 while other discovery matters were being litigated including electronic discovery and the planned depositions of the ASMs who offered declarations in support of Plaintiff's motion for class certification.

25. On March 2, 2010, Plaintiff Sandra Zirkel filed a complaint in the federal district court of Oregon on behalf of herself and all other similarly situated current and former Assistant Store Managers employed by Rite Aid within the state of Oregon for violation of Oregon's state overtime

11

wage laws.  An Amended Complaint was filed adding Thrifty Payless, Inc.

as a Defendant on March 15, 2010.  Discovery requests were exchanged

between the parties in July 2010 and responses were provided in August

2010.  Documents were exchanged in October 2010.

26.     Plaintiff filed an unopposed Motion to file a Second Amended

Complaint that was granted, and, on December 15, 2010, a Second Amended

Complaint adding Ralph Cedano as a Plaintiff was filed.  On December 17,

2010, Sandra Zirkel's claims were dismissed due to her bankruptcy filing in

which she did not list this lawsuit as a potential claim.  Shortly thereafter,

the parties addressed many issues through motion practice.

27.     On March 4, 2011, Defendants filed a motion for stay asking

that the case be stayed until the U.S. Supreme Court issued a ruling in the

*Dukes v. Wal-Mart, Inc.* case. On March 7, 2011, Plaintiffs filed a motion to

compel to obtain the names and addresses of all the other current and former

Oregon ASMs, SMs, and District Managers.  Shortly thereafter, Defendants

filed a motion for protective order seeking to preclude Plaintiffs from taking

the depositions of Store Managers John Chamberlain and Paul Oleson, and

District Manager Denny Horton, because Defendants asked the court to

resolve potential ethical considerations raised regarding representing Store

Managers at depositions when those Store Managers were also opt-in

collective action members in the *Indergit* Store Manager case pending in the

Southern District of New York.  After the motion for a protective order was filed, Plaintiffs also filed a motion to compel the three depositions that had been noticed, as well as the depositions of four *Indergit* opt-ins Defendants refused to identify.  On April 26, 2011, the Oregon court held a hearing to address these motions and granted Plaintiffs' motions to compel the class list and the depositions.  The court denied Defendants' motions to stay and motion for a protective order.  Plaintiffs then moved to file a Third Amended Complaint to add Donna Garcia as plaintiff on August 30, 2011. The court granted the motion in October 2011.

28.    Plaintiffs sought to take the depositions of non-party putative class members in support of their motion for class certification. Defendants filed a motion for a protective order on November 15, 2011, seeking to bar Plaintiffs from taking those depositions.   On December 6, 2011, the Court granted Defendants' motion for a protective order.  On March 21, 2012, Defendants filed a motion to compel supplemental responses by Donna Garcia to Defendants' Second Request for Production of Documents and Second Set of Interrogatories.  Plaintiffs opposed this motion to compel on the grounds that it sought attorney work product.  The Court denied Defendants' motion to compel on April 23, 2012.

29.    Throughout the course of litigating these various motions, the parties engaged in discovery which included written discovery and

document production, the depositions of Plaintiff Garcia, a Store Manager, a

District Manager, and a Regional Vice President, and discovery of

electronically stored information.   After these depositions, the parties

exchanged various letters concerning deficiencies in the Defendants'

responses to discovery requests.   The parties were preparing to address these

discovery matters with the Court at the time the settlement was reached.

30.   On June 16, 2009 and November 7, 2009, Justin Torres and

Priscilla Thomas, respectively, filed Complaints against Rite Aid alleging

violations of the New Jersey Wage and Hour Laws on behalf of themselves

and all others similarly situated.   On February 9, 2011, the actions were

consolidated while pre-certification discovery was ongoing in the *Torres*

matter.   In *Torres*, the parties exchanged written discovery, produced

documents, and took four depositions of putative class members.

31.   Plaintiffs filed a motion for lead counsel appointment under

Federal Rule of Civil Procedure 23(g), and the court denied the motion.

Thereafter, the parties continued with pre-certification discovery, and

exchanged documents.   Plaintiffs took a Rule 30(b)(6) deposition covering

various pre-certification topics.   Plaintiffs made a motion to compel the class

list of New Jersey ASMs which was granted on April 24, 2012.   The parties

engaged in multiple conferrals regarding various discovery issues and

deficiencies in responses to discovery requests.  Prior to Plaintiffs' filing a

motion for class certification, the parties reached a settlement.

32.   On May 5, 2011, Rene Hough filed a Complaint against Rite

Aid in the Western District of Washington alleging, on behalf of herself and

all other Rite Aid ASMs, that Rite Aid violated Washington's overtime laws.

On August 2, 2011, Rite Aid filed a motion to dismiss and/or transfer to the

Middle District of Pennsylvania.  Plaintiffs opposed the motion.  On

November 8, 2011, the Court granted the motion to transfer and the case was

transferred to the Middle District of Pennsylvania.  The case was going to

proceed under this Court's direction at the time the settlement was reached.

33.   On June 17, 2011, Robin Mazzantini filed a Complaint against

Rite Aid in the District of Massachusetts alleging, on behalf of herself and

other Rite Aid ASMs, that Rite Aid violated Massachusetts General Laws by

failing to pay overtime and all wages owed.  On August 11, 2011, Rite Aid

moved to transfer the case to the Middle District of Pennsylvania and

Plaintiff opposed the motion.  Oral argument was held on December 15,

2011 and, at that time, Judge Michael Ponser granted Rite Aid's motion to

transfer.

34.   While the *Fisher* and *Knepper* appeals were pending in the

Third Circuit, the parties filed a joint motion to stay the *Hough* and

*Mazzantini* cases since the Third Circuit's decision would determine whether

or not the cases could proceed.  After the Third Circuit ruled, the parties filed a joint motion to consolidate *Fisher, Hough, Knepper*, and *Mazzantini* for discovery purposes on April 18, 2012.

35.    On March 23, 2012, Angel Quinones filed a Complaint in the Southern District of New York against Rite Aid alleging, on behalf of himself and all Co-Managers, that Rite Aid violated New York Labor Law by failing to pay all wages due to him and other Co-Managers including overtime.  On May 10, 2012, Plaintiff voluntarily dismissed this action subject to an agreement with Rite Aid allowing re-filing in the Middle District of Pennsylvania.  On May 9, 2012, Angel Quinones re-filed his Complaint against Rite Aid which included allegations that Rite Aid also violated New Jersey Wage and Hour Laws on behalf of Plaintiff Thomas Finley and New Jersey Co-Managers.

36.    On June 4, 2009, Plaintiffs Lisa Laun and DeShawn Powell ("*Laun* Plaintiffs") filed a Class Action Complaint in the Philadelphia Court of Common Pleas alleging that Rite Aid violated the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101, *et seq.* by misclassifying them and other Pennsylvania ASMs as exempt from receiving overtime premium pay.  On July 28, 2009, Rite Aid filed preliminary objections pursuant to Pennsylvania Rule of Civil Procedure 1028(a)(6), arguing that another lawsuit titled *Janice Boyer et al. v. Rite Aid Corporation*, No. 090400455,

16

June Term, 2009[2] was filed in the same court two months prior asserting similar PMWA class action claims on behalf of Pennsylvania ASMs and Store Managers.  Rite Aid asked the Court to dismiss the *Laun* Plaintiffs' class allegations and stay their individual claims pending further order of the court.  Recognizing that the *Eaton* action was, in fact, filed first, the *Laun* Plaintiffs did not oppose Rite Aid's preliminary objections.  The *Laun* action remained stayed for over two years.

37.     While the *Laun* action was stayed, the *Eaton* action proceeded. However, after Rite Aid filed its response in opposition to Plaintiffs' motion for class certification, on May 6, 2011, the Plaintiffs in *Eaton* filed a "Motion to Withdraw Motion for Class Certification and Discontinue Class Allegations" in which they sought to, *inter alia*, have their PMWA class allegations on behalf of ASMs and Store Managers discontinued.  Then, on November 3, 2011, the Philadelphia Court of Common Pleas entered an order in *Laun* lifting the stay and setting case management deadlines.  Soon thereafter, the *Laun* Plaintiffs filed a motion for reconsideration asking that their PMWA putative class claims on behalf of ASMs be revived in light of the *Eaton* parties' desire to dismiss the same claims on behalf of ASMs and Store Managers.  On February 27, 2012, the Philadelphia Court of Common

---

[2]  In October 2009, the parties to the *Boyer* action stipulated to the dismissal of named Plaintiff Janice Boyer.  Thereafter, the *Boyer* action was re-titled *Larry Eaton, et al. v. Rite Aid of Pennsylvania, Inc. and Rite Aid Corporation*.  For ease of reference, this action is referred to herein as the "*Eaton* action."

Pleas entered an order consolidating the *Laun* and *Eaton* actions and making the *Laun* action the lead case.[3]

38.     While the stay in *Laun* was only lifted in the fall of 2011, the parties engaged in significant discovery regarding the ASM claims during this period.  This included: (i) the *Laun* Plaintiffs responding to Rite Aid's First Set of Interrogatories and Document Requests; (ii) Rite Aid responding to Plaintiffs' First Set of Interrogatories and Document Requests which included the production of over 900 documents that were reviewed by Plaintiffs' counsel; (iii) the *Laun* Plaintiffs drafting a detailed letter to Rite Aid's counsel addressing deficiencies in Rite Aid's discovery responses concerning ESI; (iv) Rite Aid's production for inspection numerous boxes of documents from the *Laun* Plaintiffs' respective stores; and (v) the *Laun* Plaintiffs serving a Second Set of Interrogatories and Document Requests on Rite Aid.

---

[3] *Eaton* included a putative class action asserting misclassification claims on behalf of Rite Aid Store Managers in Pennsylvania from April 9, 2006 to present.  Andrew Sciola, who is Settlement Class counsel of record in this case, was counsel of record in *Eaton* prior to its consolidation with the *Laun* action.  After discovery and briefing on the issue of class certification in *Eaton*, based on his experience in handling such claims, Mr. Sciola concluded that the Pennsylvania Store Manager class action claims were not amenable to class adjudication because of the differences in the job duties they performed and because the evidence demonstrated that Store Managers' primary duty was the management of the stores in which they worked, and sought to withdraw the claims without prejudice.  Subsequently, the *Eaton* case was removed, transferred and consolidated with the *Laun* action, which does not include Store Manager claims.  Plaintiffs request that the Court dismiss without prejudice the Pennsylvania Store Manager class action claims asserted in *Eaton*.  There will be no harm or prejudice to any Store Managers who were potential members of the putative Pennsylvania class action as they are free to pursue their individual claims and the statute of limitations has been tolled.

39.     On September 24, 2010, Wanda Hadra filed a Complaint against Rite Aid alleging, on behalf of herself and all others allegedly similarly situated, that Rite Aid violated the FLSA by failing to pay ASMs all wages due including overtime.  The case was filed, in part, to allow late consenting ASMs from the *Craig* case to pursue a claim against Rite Aid. On November 29, 2010, the Court granted permission to file late consents in the *Craig* matter, and the parties agreed to voluntarily dismiss the *Hadra* action on December 1, 2010.

40.     The final case, *Robert Lohman v. Rite Aid Corporation, et al.*, was filed on May 17, 2011 and alleged, on behalf of Mr. Lohman and all Rite Aid ASMs, that Rite Aid violated the New Hampshire Protective Legislation Law.  Upon review of the law, on December 14, 2011, the parties stipulated to dismissal of the case because the New Hampshire Protective Legislation Law does not apply to employers who are subject to the FLSA.

41.     This litigation also entailed a trip to the Judicial Panel on Multidistrict Litigation.  At the time that the seven cases had been filed in Maryland, New Jersey, New York, Ohio and Pennsylvania, Plaintiffs' Lead Counsel, with the respective co-counsel in those cases, filed a motion for centralization under 28 U.S.C. § 1407.

42.     After briefing, including Rite Aid's opposition, and argument before the Judicial Panel, on December 2, 2009, Plaintiffs' motion was denied, thereby leading to the continued filing and separate litigation of the various cases addressed above.  By virtue, however, of the JPML ruling, which directed the parties to work cooperatively in the various actions, repeatedly during the litigation, both sides invoked the ruling to try to focus the litigation efforts, both between and amongst themselves and also vis-à-vis the various courts hearing matters.

43.     In summary, through the discovery process, the parties engaged in eighty-one depositions of ASMs and store and corporate witnesses and exchanged more than a million pages of documents covering issues relating to Rite Aid's training programs, policies and procedures for store operations and merchandising, the ASMs' job duties and responsibilities, and "store-level" documents that pertain to the duties being performed and assigned at the local stores.

44.     Moreover, Rite Aid produced thousands of pages of electronic documents including "SYSMs" which are akin to electronic mail sent to the local stores and the ASMs.

45.     The SYSMs provided additional insight into the day-to-day job duties that ASMs performed.

46.    This large scale discovery put the parties in an exceedingly well-informed position to evaluate the merits of their claims and defenses including the possibilities that certification would be granted or denied in the state law actions or, alternatively, that the FLSA actions would or would not be decertified.

47.    Class Counsel and Settlement Class Counsel are uniquely informed of the matters in this case inasmuch as they have spoken to a substantial percentage of the Class Members throughout the United States – literally from coast to coast (from Maine to New York to Pennsylvania to Oregon and other states) – during this litigation and, accordingly, gained a unsurpassed perspective of the strengths and weaknesses of their claims against Rite Aid.

48.    Plaintiffs can unequivocally say – and believe this cannot be gainsaid – that the proposed Settlement is the product of two fully informed sides negotiating intensely at arm's length.  The mediation itself was a mult-month long matter and, by agreement, the parties agreed to use one of this Circuit's best known former "settlement judges," the Hon. Joel Rosen, former Magistrate Judge in the District of New Jersey.  After agreeing upon Judge Rosen, there was first a mediation session held in November 2011 and then, over the following months, multiple calls with Judge Rosen as he continued to discuss matters with the parties, encourage them to proceed,

and thereupon reach a resolution.  It is fair to say that the mediation process was, itself, contentious and hard fought as each side pressed its case forward.

49.    Class Counsel believe that the Settlement offers a fair and reasonable resolution of the litigation and incorporates and recognizes the substantial risks each side faced, whether at more trials or upon appeals, had the litigation continued.

50.    The reaction from the Settlement Class has been overwhelmingly positive, and Class Counsel has received numerous messages of thanks from Class Members who support this settlement.

51.    The litigation between the parties to this Settlement has been intense – several years of day-in-day-out litigation in multiple federal and state venues.

52.    The scope of litigated matters has been varied and comprehensive – from substantive issues that required addressing at the Third Circuit, to a MDL petition, to discovery disputes that are essentially innumerable.

53.    By the time that the parties agreed to discuss settlement, there can be no question whatever that both sides were well versed in the facts, circumstances and law applicable to the disputed issues and had a comprehensive knowledge of what a potential trial record would look like.

54.     The settlement is designed to provide compensation for back pay and liquidated/statutory damages claims asserted under each applicable law set forth in the lawsuits, both federal and state, in exchange for a release for those claims (the state law claims pursuant to the Rule 23 class and the FLSA claims for those who returned claim forms).

55.     To date, 1,961 such forms have been received and Class Members have until November 23, 2012 to return Claim Forms.

56.     By way of comparison in the *Herring v. Hewitt*, No. 3:06-cv-267 (D.N.J.) case, a misclassification settlement previously approved in the District of New Jersey, the settlement provided an average of $3,111.26 to each claimant.  Likewise, the Settlement is on par with a misclassification settlement against CVS Caremark Corporation on behalf of its Assistant Store Managers wherein the estimated average value for the Class Members was $1,760.  *Nash v. CVS Caremark Corp*., 1:09-cv-00079 (D.R.I.).  The claims in that case are analogous to those here (alleged misclassification claims on behalf of retail drug store chain assistant store managers), and the United States District Court Judge McConnell in the CVS matter termed the result "magnificent" in his final approval order.

57.     Without exception, to date, the response of the Class members has been positive and Class members have explained that family

circumstances, such as job losses from the recession, have made the anticipated receipt of the settlement proceeds particularly valuable.

58.    If this litigation were to proceed, significant expense and delay would result, which likely would not benefit the members of the Class.  This litigation involves fourteen federal cases, most of which arise from different federal courts, which all have been consolidated in this Court for purposes of settlement only.  While significant discovery has occurred in many of the cases as discussed above (*e.g.*, *Craig, Ibea, Elliot/Fermin/Witty, Torres/Thomas, Cedano/Garcia,* and *Doyon*), there were additional discovery and/or pretrial matters to be undertaken, and, in any event, in the other cases additional discovery would be necessary in the remaining cases would be necessary in the remaining cases which are in different procedural postures.  For example, in the *Finley*, *Fisher*, *Hough*, *Knepper*, *Laun*, *Mazzantini*, and *Quinones* actions, class certification discovery was going to proceed which would include, among other things, depositions of putative class members and various corporate employees throughout the United States and document production including expensive electronic discovery. These depositions, alone, would have cost both substantial amounts in time and expenses.  Given the history of this litigation, it is expected that the courts would need to resolve many discovery disputes which would require further briefing, necessitating attorney time to research issues and prepare

motions and responses and burden the courts with having to decide numerous discovery disputes.

59.    Even if one or more classes were certified (which Plaintiffs believe they could well have obtained and Defendants submit would likely not occur), post-certification discovery could have been expected to address aspects of the merits of each ASM's claims such as Rite Aid's defenses relating to its decision to classify ASMs as exempt from overtime in these various states where the cases were pending.  Moreover, Rite Aid could have proceeded to summary judgment or other motion practice that would have taken more time and could have been dispositive. Thereafter, the parties would prepare pretrial submissions (whether on a class or collective or individual basis) – a significant undertaking given the required analysis of more than one million pages worth of documents and deposition testimony from scores of witnesses – and ultimately attempt to try multiple class and collective actions in various courts throughout the United States, risking multiple different outcomes.

60.    As Class Counsel knows from experience in the collective action trial against Staples, Inc., involving Sales Managers, six weeks of trial time was necessary which, again, caused delay and a major expense for both sides.

61.     Notice has been given to the Class in accordance with the

Settlement Agreement and the Preliminary Approval Order.  To date, not a

single Class member out of 7,342 has objected.

62.     A most singular indication of fairness of a proposed class

settlement is the reaction of the class.  While Class Counsel believed, in

negotiating the Settlement, that the settlement payments, which will average

$1,845 for each Class member, would be fair and reasonable, given the

inherent risks of litigation, the reaction of the Settlement Class here

underscores the correctness of that belief.  It is to be further noted that the

amount that individuals will receive will be determined by the length of their

employment, a reasonable and equitable way to proceed and, in actuality,

Class Members were informed of the amounts they were likely to receive in

the Class Notice.  Class Counsel believes that the result is fair and

reasonable when considering the difficulty and risks of litigating class

claims involving alleged misclassification of employees under the executive

and administrative exemptions of the FLSA and analogous state laws.

63.     The parties learned through discovery how this litigation would

likely play out and the strengths and weaknesses that existed on both sides.

While new arguments and refinements of old arguments might have been

anticipated (and ultimately have occurred), the history of the litigation was

such that the parties were, to an unusual and rare degree, knowledgeable

26

about the case and in a position to make informed decisions. The parties have completed a huge amount of discovery (including obtaining experts to work through complicated electronic discovery issues) for more than three years and were embarking on what would have been another yet additional and not insubstantial amount of discovery (including, specifically, electronic discovery, depositions, document production, etc.) at the time that they agreed to the terms of a settlement.

64.   That the Settlement was not reached in undue haste is certainly underscored by the fact that the parties ultimately required an in-person mediation session followed by numerous informal settlement discussions between the parties and with the mediator over the course of several months. After agreeing to the principle terms of the Settlement, negotiations extended for yet another month over the terms of the Settlement Agreement before the Settlement was finalized.

65.   The proposed settlement is substantially higher than Rite Aid had long indicated it was prepared to pay to settle the litigation because of, among other things, Rite Aid's position that ASMs were properly classified, its belief that the claims could not properly proceed through trial on a class or collective basis, and its fiscal position.

66.     The Settlement Fund will also pay state and federal taxes imposed on Rite Aid as an employer as a result of payments made to members of the Class under this Settlement Agreement.

67.     It is worth noting that in the closest parallel case to which this litigation can be compared, the nationwide settlement against CVS last year on behalf of CVS ASMs, discussed in paragraph 56, above, settled for $34 million, with essentially the same recovery for class members and, in that case, as noted, United States District Court Judge McConnell termed the result "magnificent."  Class Counsel believes that the Settlement plan is eminently fair, reasonable, and adequate, permitting payment based upon length of service within the Class.

68.     On behalf of Class Counsel and Settlement Class Counsel, Class Counsel requests reimbursement of expenses in the amount of $273,598.62 to cover costs associated with legal research, discovery, travel, depositions, mediation, meals, transportation, court fees, mailing, postage, and telephone.  *See* paragraph 87, below.  These expenses are reasonable given the full scope of this litigation to date, are documented on the books of Class Counsel and Settlement Class Counsel, and are reasonable in relation to the Settlement Fund and should be awarded.  On behalf of Class Counsel and Settlement Class Counsel, Class Counsel also seeks an award of attorneys' fees in the amount of $6,693,067.38 ($6,966,666 less expenses of

$273,598.62), which represents 32% of the Settlement. The Class was informed of this request in the Notice materials and (as yet) no Class Member objected. Class Counsel has indisputably invested significant time and resources into the prosecution of this litigation, all on a contingency fee basis with no guarantee of repayment.[4]

69.    The total lodestar for Class Counsel and Settlement Class Counsel to date (see paragraphs 82-84, below) is $5,648,473.33. Thus Class Counsel's attorneys' fees request of $6,693,067.38 results in a multiplier of 1.2, a most reasonable, if not modest, multiplier. Moreover, in all likelihood there will be extensive additional time expended in order to oversee the Settlement, prepare for the final approval hearing, and to handle a significant volume of calls from Class members, which will reduce the multiplier further.

70.    The Settlement Class Representatives stepped forward to place their names on the various complaints that were filed and all provided substantial support to this litigation by fulfilling their commitments in that regard. They aided Class Counsel when investigating the cases and in formulating responses to interrogatories and document requests. All the Settlement Class Representatives provided valuable information about their

---

[4] Class Counsel notes that, in *Herring v. Hewitt*, the court awarded attorneys' fees amounting to 33% of the common fund.

experiences working for Rite Aid, made themselves available as needed, and stayed in touch with Class Counsel throughout the litigation.

## NOTICE AND CLAIMS ADMINISTRATION

71.    Attached as Exhibit A hereto is the Declaration of Jason Zuena, Senior Director of Operations of Garden City Group, Inc. ("Garden City Group"), appointed by the Court to be Claims Administrator, which affidavit sets forth the notice that was effectuated pursuant to the Court's direction in the order preliminarily approving the settlement and the response of the collective action and Class members that comprise the Settlement Classes.

72.    As set forth in Mr. Zuena's Declaration, Garden City Group has complied with providing notice to the Classes pursuant to the Settlement Agreement and the Court's Preliminary Approval Order, including the establishment of a website and toll-free telephone line and the mailing of the Notice to the Class.  Ex. A (Zuena Decl.) at ¶¶ 2-15.  Garden City Group has taken care of such matters as the notifications required under the Class Action Fairness Act, remailings, skip-tracings, inquiries from Class members (still ongoing), resolving disputed dates of employment (still ongoing), deficiency notifications (still ongoing), and dealing with death beneficiaries.  Ex. A (Zuena Decl.) at ¶¶ 2-15.

73.    Garden City Group will continue to perform these duties and those outlines in the Settlement Agreement and Preliminary Approval Order

until the claims period closes on November 23, 2012.  To date, Garden City

Group received 1,961 valid claims from Class Members.  For all Claim

Packets mailed, the highest estimated gross amount of any individual Class

Member was $9,135, and the estimated average gross value of all Class

Members was $1,845.  *See* Zuena Decl. at ¶ 5 n. 3.

74.     Throughout the course of the notice and administration to date,

Class Counsel has received scores of calls, emails, and inquiries from Class

Members about the Settlement.  The calls posed a wide range of questions –

from seeking to pass on address changes or request re-mailings to questions

about dates or what Class members should expect on a going forward basis.

But perhaps the most common question has been when the money might be

expected to be received.  My staff and I have handled these calls that went to

Klafter Olsen & Lesser LLP.  Without exception, I am pleased to be able to

state that the response of the Class members has been positive.  Class

members have explained that family circumstances, such as job losses from

the recession, have made the anticipated receipt of the settlement proceeds

particularly valuable.

75.     Garden City Group anticipates that the total cost of

administration to be $332,000.  Ex. A at ¶ 14.   This number is, in my

experience, reasonable and should be approved by the Court.

## CLASS COUNSEL'S REQUESTS FOR AN AWARD OF FEES AND EXPENSES AND INCENTIVE AWARDS TO THE <u>CLASS REPRESENTATIVES</u>

76.     Class Counsel ask the Court to approve payment of (1) an award of attorney fees in the amount of $6,693,067.38; (2) reimbursement of Class Counsel's reasonable out-of-pocket costs and expenses, which are in the amount of $273,598.62, and (3) incentive awards in the amounts of $7,500 to named Plaintiff Shirley Craig and $5,000 to named Plaintiffs Eddie Ibea, Jose Fermin, Justin Torres, Jennifer Elliot, Priscilla Thomas, James Fisher, Robert Vasvari, Daniel Knepper, Ralph Cedano, Donna Garcia, Rene Hough, Sheryl Doyon, Robin Mazzantini, Lisa Laun, DeShawn Powell, Yvon Witty, Angel Quinones, Thomas Finley, Larry Eaton, and Karriem Perkins, for their services as the Settlement Class Representatives, all of which requests Defendants agreed not to oppose.

77.     Attached as Exhibits B-M hereto are declarations from each of the Class Counsel and Settlement Class Counsel law firms attesting to the work they put into this litigation and setting forth other relevant information. These declarations are (by exhibit identification):  (B) Klafter Olsen & Lesser LLP; (C) Winebrake & Santillo, LLC, (D) Hepworth Gershbaum & Roth PLLC; (E) Whitfield Bryson & Mason, LLP; (F) Fibich, Hampton & Leeborn, LLP; (G) Barkan Meizlish Handelman Goodin DeRose Wentz LLP; (H) Stoll Berne Lokting & Shlachter P.C.; (I) Cuneo Gilbert &

LaDuca, LLP; (J) Murray, Plumb & Murray; (K) Pogust, Braslow &

Millrood, LLC; (L) Khorrami, LLP; & (M) Berger Attorney, P.C.

78.     The expertise and experience of Class Counsel and Settlement

Class Counsel and their views are an important factor to consider in

assessing the reasonableness of this Settlement.  As the attached law firm-

specific declarations demonstrate, Class Counsel has significant experience,

and success, in the areas of law relevant here:  wage and hour litigation and

complex and class actions.  As stated above and reiterated here, it is the

opinion of Class Counsel and Settlement Class Counsel that the Settlement

achieved is fair, adequate and reasonable and should be approved by this

Court.

79.     The work performed by Class Counsel and Settlement Class

Counsel in attaining the settlement should also be evaluated in light of the

quality of the opposition.  Defendants were represented by three highly

experienced and respected law firms, Ogletree Deakins Nash Smoak &

Stewart, P.C., Epstein Becker & Green, P.C., and Pepper Hamilton, LLP.

These firms spared little effort or no expense in defending Rite Aid in this

case – as demonstrated, to use but three examples, by the decision to take

more than 50 depositions of Rite Aid ASMs, collect declarations from more

than one hundred ASMs nationwide, and by the avowed willingness to take

these cases to trial should the cases not settle.  Likewise, and without

belaboring the point, throughout the litigation, there were many motions and requests for Court intervention, all of which are testament to a dogged and tenacious defense of the case.[5]  In all, there can be no doubt that in reaching this substantial Settlement, the work undertaken was significant.

80.     Finally, the reaction of the Class to the Settlement strongly supports approval of the fee award and cost reimbursement request.  The Court-approved notice was clear and explicitly stated that "Settlement Class Counsel will apply to the Court for legal fees and expenses in an amount of no more than thirty three and one-third percent (33 1/3%) of $20,900,000." Lesser Decl. Ex. A at p. 6.  At least as of today, no objections have been received and it is unlikely that any material number will be filed.

81.     The time spent by Class Counsel in prosecuting this litigation – 14,021.59 hours was spent in the prosecution and settling this litigation, as summarized in paragraphs 2-46, above.  Even with the substantial effort expended by Class Counsel, the prosecution of this action proceeded in an efficient manner.  Work was handled primarily by those attorneys involved in the case, who had the greatest experience in the relevant area of the law or of the case, and time was not wasted by a multiplicity of attorneys assigned to the same tasks.   Where necessary and cost effective, legal assistants and

---

[5]  As further evidence of the tenacious defense, Rite Aid's counsel investigated the bankruptcy status of every *Craig* opt-in (more than 1,000) and made summary judgment motions against each opt-in who filed a bankruptcy petition during the relevant time period which would cause parts or all of the opt-ins' claims to be dismissed.

paralegals were employed.  Assignments, whether related to discovery or

briefing, were given to those lawyers known to have abilities and expertise

in those areas, or, as the case progressed by those attorneys with the greatest

experience in that aspect of the litigation.  As such, the cumulative time of

14,021.59 hours for all the work that this case entailed was reasonably and

efficiently expended.   While the hours are considerable, there can also be no

fair question but that the work expended was also quite considerable

inasmuch as it has entailed virtually every aspect of litigation other than

trial, even with an appellate decision from the Third Circuit.

83.      Each of the firm declarations attached as Exhibits B through M

contains descriptions of the work that each firm undertook – as the Court

will see that work was most substantial.  Indeed, the summaries and

descriptions of the work undertaken comprises approximately 550 pages of

summaries and time records in the declarations, which, to avoid repetition

and unnecessary enlargement of this declaration, is not repeated and set forth

herein, but which the Court can review to see its nature and scope.  *See*

Declaration Summaries Ex. B at 1-13, Ex. C at 1-7, Ex. D at 1-3, Ex. E at 1-

4, Ex. F. at 1-2, Ex. G at 1-3, Ex. H at 1-7, Ex. I at 1-2, Ex. J at 1-3, Ex. K at

1-3, Ex. L at 1-4, and Ex. M at 1-2.

83.     All of the time and effort that Class Counsel put into this litigation was done on a contingent basis with no guarantee of repayment in whole or part.

84.     Specifically, the total number of hours spent on this litigation so far by Class Counsel in accomplishing the work of the case has been 14,021.59 hours, consisting of:  3876.64 hours by KOL for a lodestar of $1,848,084 (*see* Ex. B at 11-13 (Lesser Decl.)); 2394.70 hours by Winebrake & Santillo, LLC for a lodestar of $1,077,590 (*see* Ex. C at 6-7 (Winebrake Decl.)); 1833.28 hours by Hepworth Gershbaum & Roth PLLC for a lodestar of $863,159.83 (*see* Ex. D at 2 (Hepworth Decl.));  1277.75 hours by Whitfield, Bryson & Mason LLP for a lodestar of $442,809.50 (*see* Ex. E at 3 (Migliaccio Decl.)); 368.99 hours by Fibich, Hampton & Leeborn, LLP for a lodestar of $146,281.05 (*see* Ex. F at 2 (Josephson Decl.)); 1663.90 hours by Barkan Meizlish Handelman Goodin DeRose Wentz LLP for a lodestar of  $333,742.20 (*see* Ex. G at 2-3 (DeRose Decl.)); 1171 hours by Stoll Stoll Berne Lokting & Schlachter, P.C. for a lodestar of $339,692 (*see* Ex. H at 6-7 (Larson Decl.)); 358.50 hours by Cuneo Gilbert & LaDuca, LLP for a lodestar of $151,877.50 (*see* Ex. I at 2 (Warren Decl.)); 206.9 hours by Murray, Plumb & Murray for a lodestar of $65,309.50 (*see* Ex. J at 2 (O'Meara Decl.)); 290.78 hours by Pogust Braslow & Millrood, LLC for a lodestar of $116,190.50 (*see* Ex. K at 3 (Sciolla Decl.)); 563.95 hours by

Khorrami LLP for a lodestar of $254,617.25 (*see* Ex. L at 3 (Drexler Decl.));

and 15.2 hours by Berger Attorney, P.C. for a lodestar of $9,120 (*see* Ex. M

at 2 (Berger Decl.)).  The total lodestar is $5,648,473.33.  The time this

reflects was time actually spent, in the exercise of reasonable judgment by

the lawyers and staff involved, and is reflected on the books and records of

the firms in the contemporaneous recorded time records, which Class

Counsel and Settlement Class Counsel have attached to their declarations.[6]

85.     Time spent in preparing the fee declarations and the Fee

Memorandum is not included in this lodestar, although this is a necessary

part of the case.  Moreover, the time spent from now, and in connection with

and at the Final Approval hearing is also not included.  Nor is included the

work that will be necessary hereafter in addressing inquiries from Class

members in connection with the Settlement.  Based upon prior experience,

there will be scores of telephone calls and correspondence from Class

members in the coming months wanting to know about the status of the

settlement, to ask where their checks are, to inquire why they were not paid

(usually because they failed to submit the claims forms or failed to submit

them properly or timely), to request reissued checks, etc.  There will, in

addition, also be time spent overseeing the finalization of the claims process

---

[6] Some redactions have been made to preserve attorney-client privilege and attorney work product.

through Garden City Group.  Based upon experience, such time could easily reach into several hundred hours.

86.    Class Counsel's request for payment of fees in the amount of $6,693,067.38 represents a positive multiplier of 1.2, and, given the risk presented by this litigation and the results obtained, we submit this is a most reasonable enhancement.  *See* Final Approval Memorandum at 55-56.

87.    Class Counsel and Settlement Class Counsel seek reimbursement of $273,598.62 in litigation expenses reasonably and actually incurred in connection with commencing and prosecuting this case against the Defendants.  These are the amounts of expenses actually incurred, as set forth in the books and records of the firms and attested to in the firm declarations attached hereto.  *See* Ex. B at 14-15 (KOL, $93,157.38); Ex. C at 7 (Winebrake & Santillo, LLC, $32,977.51); Ex. D at 3 (Hepworth Gershbaum & Roth PLLC, $10,870.77); Ex. E at 5 (Whitfield, Bryson & Mason LLP, $37,355.69); Ex. F at 3 (Fibich, Hampton, & Leeborn, LLP, $28,689.81); Ex. G at 4-5 (Barkan Meizlish, $24,918.60); Ex. H at 8-9 (Stoll Stoll Berne, $24,374.10); Ex. I at 3-4 (Cuneo Gilbert & LaDuca, $12,722.71); Ex. J at 3-4 (Murray, Plumb Murray, $1,196.91); Ex. K at 4 (Pogust Braslow, $755.67); and Ex. L at 5-6 (Khorrami, $6,579.47).  Class Counsel and Settlement Class Counsel advanced all of the incurred litigation expenses.  As to expenses, which constitute out-of-pocket monetary

expenses, from the beginning of the case, Class Counsel and Settlement

Class Counsel were aware that they might not recover any of their expenses,

and, at the very least, would not recover anything until the litigation was

successfully resolved.  Class Counsel and Settlement Class Counsel also

understood that, even assuming that the case was ultimately successful,

reimbursement of litigation expenses would not compensate them for the

lost use of the funds advanced by them to prosecute this action.  Thus, Class

Counsel and Settlement Class Counsel were motivated to, and did, take

significant steps to minimize expenses whenever practicable without

jeopardizing the vigorous and effective prosecution of the litigation, the

latter being the most important consideration.  In addition, Class Counsel

and Settlement Class Counsel request an award in the amount of $2,500 to

encompass the incidental expenses that can reasonably be expected to be

incurred hereafter in effectuating the settlement, such expenses to include,

for instance, the travel and other costs associated with the Final Approval

hearing, the postage and FedEx charges that will be incurred in addressing

matters with Settlement Class members and the Claims Administrator,

related and incidental copying and telephone costs, and the like.  In my

experience, with a Settlement Class this large such costs are certainly going

to be incurred, and the requested $2,500 is almost certainly less than they are

likely to be.

88.     The expenses already incurred or spent are reflected on the

books and records maintained by Class Counsel and Settlement Class

Counsel.  These books and records are prepared from expense vouchers,

check records and other source materials, and are an accurate record of the

expenses incurred.   Copies of these records will be provided to the Court

should it request them.  The expense items were billed separately by Class

Counsel and Settlement Class Counsel from the time records, and such

charges are not duplicated in the respective firms' billing rates.

## THE PROPOSED AWARDS TO THE CLASS REPRESENTATIVES

89.     The Settlement provides incentive awards of $7,500 to Shirley

Craig and $5,000 each to Shirley Craig, Eddie Ibea, Jose Fermin, Justin

Torres, Jennifer Elliot, Priscilla Thomas, James Fisher, Robert Vasvari,

Daniel Knepper, Ralph Cedano, Donna Garcia, Rene Hough, Sheryl Doyon,

Robin Mazzantini, Lisa Laun, DeShawn Powell, Yvon Witty, Angel

Quinones, Thomas Finley, Larry Eaton, and Karriem Perkins, the Settlement

Class Representatives.  These individuals all not only agreed to "step up"

and undertake class representation on behalf of the putative classes in their

various cases but most of them responded to discovery and were deposed as

part of the action.  As noted, Class Counsel believes these individuals

materially assisted the prosecution of this litigation and that the awards

would be reasonable and warranted under the circumstances and in

conformity with governing precedent.  *See* Final Approval Memorandum at 56-58.

90.     The fact that these rewards would be requested was also set out in clear terms in the Notice.  *See* Ex. A at p. 6.  No class member has objected to these requested incentive awards to date.

**WHEREFORE**, as Class Counsel, I respectfully request the Court to (A) approve the proposed Settlement of this action; (B) approve Class Counsel's request for an award of fees and costs, (C) approve the requested incentives awards to the named Plaintiffs for their service as Class Representatives, and (D) approve the requested fees of up to $332,000 for the Claims Administrator.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected. Executed on this 24th day of September 2012, in Rye Brook, New York.

/s/ Seth R. Lesser

_____

Seth R. Lesser